O’NIELL, J.
The Houston Ice & Brewing Company owns a mineral lease on the N. W. Yi of the S. W. Vi of S. AY. Vi of section 14, T. 21 N., R. 15 W. The Murray Oil Company owns a mineral lease on the N. E. Vi of the S. AY. Vi of S. W. Vi of the same section. The two tracts together form what is supposed to be a parallelogram, the northern and southern boundary lines of which are supposed to be 20 chains long, and the eastern and western boundary lines of which are supposed to be 10 chains long. The Houston Ice & Brewing Company’s lease is on the square tract forming the west half of the parallelogram, and the Murray Oil Company’s lease is on the square tract forming the east half of the parallelogram. The dispute is as to the correct location of the dividing line between the two tracts, and that depends upon the correct location of the west boundary line of section 14, which, of course, is the west boundary lino of the land leased to the Houston Ice & Brewing Company.
The Houston Ice & Brewing Company erected a derrick and was proceeding to drill an oil well near the dividing line between the two tracts. The Murray Oil Company brought suit, alleging that the well was being drilled on the east side of the dividing line, and obtained a writ of injunction, preventing the Houston Ice & Brewing Company from proceeding with the drilling of the well. The court appointed two surveyors, one to represent the plaintiff and the other to represent the defendant in the injunction suit filed by the Murray Oil Company. The Murray Oil Company also employed two surveyors. They located the north end of the dividing line between the ,two tracts at a point north 74° 30' west, 1 link and 37 chains from the point where the surveyors appointed by the court located it. And the surveyors employed by the plaintiff, Murray Oil, Company, located the south end of the dividing line at a point north 68° 15' west, 1 chain and 21 links from the point where the surveyors appointed by the court located it. Thereafter the Murray Oil Company voluntarily discontinued the injunction suit. In the meantime the Murray Oil Company had drilled a well, which is about midway between the two lines, and which is therefore on the Houston Company’s lease, if the surveyors appointed by the court have located the dividing line correctly, and is on the Murray Company’s lease, if the surveyors employed by that company have located the dividing line correctly. It appears that the well which was commenced by the Houston Company, and of which the injunction prevented a completion, is on the Houston Company’s lease, even if the surveyors employed by the Murray Company were correct in their location of the dividing line. AYe are not certain of that fact, and it may not be important to the issues now presented, but it appears so on one of the maps in the record; and perhaps that is the reason why the Murray Company voluntarily discontinued or dismissed the injunction suit. The well drilled by the Murray Company, while the writ of injunction was in force, produced only salt water and was abandoned.
The Houston Company therefore brought suit against the Murray Company for $51,-380.75 damages, alleging that the salt water-well was drilled in a negligent manner, that it was not properly cemented when the. pipe-was removed, and that the salt water had spoiled the oil-bearing sand so. as to damage the Houston Company to the extent, of $50,-000; and alleging that the injunction suit had cost the Houston Company $1,380.75, by compelling the company to erect another der *231 rick further west from the dividing line.
Thereafter the Hurray Company filed another suit, alleging that the Houston Company was trespassing upon the Blurray Company’s land, and obtained a writ of injunction to prevent further trespass. The Houston Company then filed a supplemental petition in its suit, alleging that the Murray Company was trespassing upon the Houston Company’s land, and praying for an injunction to prevent further trespass. The district court refused to isstie the writ of injunction asked for by the Houston Company, on the ground that it would be a stultificacation of the injunction already granted in favor of the Murray Company. The Houston Company then applied to this court for a writ of mandamus to compel the district court to issue a writ of injunction against the Murray Company. This court concluded that the language of the prayer of the petition of the Murray Company for the writ of injunction issued at its instance, ■ and • the language of the writ itself, was such that the injunction only prevented the Houston Company from trespassing upon the Murray Company’s lease, wherever the dividing line might be; and that therefore the injunction did not interfere with the right of the Houston Company to obtain an injunction preventing the Murray - Company from trespassing upon the lease claimed by the Houston Company. The writ of mandamus was therefore made peremptory, ordering the issuance of an' injunction against- the Murray Company. In its supplemental petition the Houston Company also prayed for $250 damages for attorney’s- fees incurred on account’ of the injunction obtained by the Murray Company. The two cases were, by consent, consolidated áñd'tried aV one-suit. They iver'Aproperly treated- as-an action-to fix the boundary line between ■ the two -leases. The district- court ¿dopted ■ as correct the survey made ■■ by the-surveyors-appointed by'the co'urt;-and:;rejected the survey made by the surveyors ' employed by the Murray Company. The court .concluded that the Houston Company’s de-mand for $50,000 damages for the alleged spoiling of the oil-bearing sand was not sustained by the evidence. The court, however, gave .judgment in favor of the Houston Company for all other items of damage claimed, .amounting to $1,630.75. The Murray Company has appealed from the judgment, and the Houston Company, answering the appeal, prays that the judgment be increased to $51,-630.75.
It is conceded that the main question presented is whether the survey made by the surveyors employed by appellant or that which was made by the surveyors appointed by the court is correct. It is certain that both surveys are not correct, though not certain that either is correct.
The difficulty about locating the west boundary of section 14 is that the northwest corner and the southwest corner of that section are both lost or obliterated standard corners, which have to be relocated on the standard parallels. The surveyors appointed by the court did not undertake to restore or relocate, as an obliterated standard corner, the northwest corner of section 14. They restored or relocated only the southwest corner of section 14,- which they did by following I the calls of the original government survey from the nearest identified original standard : corner, supposed to be half a mile south from the southwest corner of section 14; that is, in the center of the dividing line extending north and south between sections 22 and 23. To explain the relativity (thanks to Prof. Einstein) of the nearby identified original standard corners, without having to annex a map to this opinion, we must give the location of the following sections; Immediately west of section 14 is section 15, and immediately west of that is. section 16, etc. ' Immediately-north- of section 14 is section 11; im *233 mediately west of that is section 10; and west of that is section 9, etc. Immediately south of section 14 is section 23; west of that is section 22; and w'est of that is section 21, etc.
The surveyors appointed by the court commenced at the southwest corner of section 21, which is said to be an identified original standard corner, two miles west and one mile south from the southwest corner of section 14. They ran east one mile to the southeast corner of section 21, which they also identified as an original standard comer. Thence they ran east one mile to the southeast corner of section 22, which they checked and verified by reference to the field notes, as .a standard corner. They ran thence north on the dividing line between sections 22 and 23 to the center of the line, where they found an identified original standard quarter corner, When we say they ran north, we mean that they ran on the variation which they had adopted as correct; and which had been obtained by adding the five variations which they had found between as many identified original standard comers and by dividing the result by five. They did that because of errors in the original government survey made by Y'illiamson Jones, deputy United States surveyor. It appears that the errors could not be corrected otherwise, because they were not uniform errors, or such as might have resulted from his having used a chain that was not of standard length, or having worked on a uniformly wrong variation. Having arrived at the nearest identified original standard corner, being the southwest corner of the N. W. % of section 23,. the surveyors projected the west boundary line of that section north, by following the calls of the original survey, on such course and to such distance as to locate the southwest corner of section 14. Assuming their location of that corner to be- correct, they projected the line north, with the same variation, a distance of 660 feet, or 10 chains, and thus located the southwest corner of appellee’s lease. From that corner they projected the same line north, with the same variation, 660 feet, or 10 chains, and located the northwest corner of appellee’s lease.
The surveyors employed by appellant' commenced at the northwest comer of section 15, which is conceded to be an identified original standard corner. They ran. S. 89° 51' E. S0.10 chains, to the supposed northwest corner of section 14, where they drove a temporary stake; thence E. 79.75’ chains, to the supposed northeast corner of section 14. There they fell S. 38° W. 1.68 chains from a rock supposed to mark the original standard corner. The bearing from the northwest corner to the northeast corner of section 14 being S. 89° 56', E., instead of being due east, the temporary point established by the surveyors as the northeast corner of the section was 9 links north from the supposed original standard corner. The surveyors therefore returned to the northwest corner of section 14 and moved their temporary stake 84 links, on a line bearing N. 38° E., and iflaced it 4% links further north. Having thus distributed the errors in the original survey, they there located the northwest corner of section 14 as a restored standard corner. They ran thence south 60 chains to the supposed northwest corner of appellee’s lease; thence 10 chains to the supposed southwest corner of appellee’s lease; thence 10 chains to the supposed southwest corner of section 14, where they placed a temporary stake; thence south 40 chains to the supposed southwest corner of N. W. •% of section 23. There they found the identified original standard quarter corner, 1 chain and 96 links, on a bearing. S. 61° 50' E., from the end of their line. They then went to the southeast corner of ’ section 14, which is an identified original standard corner, and ran west 79.62 chains to the supposed southwest corner of section 14,.where they placed a temporary stake.. They ran *235 thence S. 89° 54' W. 80.19 chains, to the supposed southwest comer of section 15, where there is no identified original standard corner; thence S. 89° 57' W. 79.88 chains, to the supposed southwest corner of section 15. There they found an identified original standard corner 1 chain and 45'links, on a bearing S. 20° 30' W., from the end of their line. They then returned to the southwest corner of section 14 and corrected the location of their last-mentioned temporary stake, by moving it a distance of 48% links (being one-third of the discrepancy which they had found in the distance from the southeast corner of section 14 to the southwest corner of section 16), on a bearing S. 20° 30' W. They then discovered that the bearing on which they had run the southern boundary of section 16 was one-quarter of a degree further north than it should have been, which required them to move their last mentioned temporary stake 4% links further south. They then made a further adjustment in the location of the first temporary stake which they had driven to represent the southwest corner of section 14, and found that it was 48 links, on a bearing S. 37° 5' E., from the last temporary stake which they had placed on the lino running from east to west. They divided that distance and located or restored the standard corner midway between the two temporary stakes. They then located the southwest corner of appellee’s lease at a point one-eighth of the distance from the southwest corner to the northwest corner of section 14, which they had restored or relocated; and they located the northwest corner of appellee’s lease at a point one-quarter of the distance from the southwest corner to the northwest corner of section 14. They located the northeast corner and the southeast corner of appellee’s lease as being distant from the northwest corner and southwest corner, respectively, one-eighth of the width of the section, and on bearings or lines running parallel with the south boundary of the section.
The objection urged by appellant’s counsel to the survey made by the surveyors appointed by the court is that they did not attempt to restore the lost or obliterated standard northwest corner of section 14. The further-objection to that survey is that the lost or obliterated southwest corner of section 14 was not restored by connecting two identified original corners on opposite sides of the missing corner. The location was made by projecting the line from an identified original standard corner on the south side of the lost or obliterated corner or perhaps by projecting the line between two identified original standard corners, both on the south side of the lost or obliterated corner, northward to the supposed point of the lost or obliterated corner. ■
The objection to the survey made by the surveyors employed by appellant is that the location of both the northwest corner and the southwest corner of section 14 was made by taking lateral measurements on opposite sides of the parallel, or line to be located, instead of connecting two identified original standard corners beyond the ends of the line to be located.
[1,2] The evidence in this case does not show where is the nearest identified original standard corner on a continuation of the west boundary of section 14, extending north. If there is an identified original standard corner nearby, on. a continuation of that line- northward, the correct way to relocate the west boundary line of section 14, and thereby to restore the two obliterated standard- corners, would be to project a straight line from the identified original standard quarter corner on the west line of section 23 northward to the nearest identified original standard corner on a continuation of the supposed west boundary line of section 14. That is our interpretation of the appropriate One- of the rules established by the General Land Office and approved by the courts generally. 9 O. J. p. 164 et seq. The relocation of the north *237 boundary line of section 14 should be made, by projecting a straight line from the nearest identified original standard corner towards the east (which appears from the record in this case to be the northeast corner of section 14), to the northwest corner of section 15. The point where that projected line will cross the line projected from the identified original standard quarter corner on the west boundary line of section 23, northward to the nearest identified original standard corner or quarter corner, should be the northwest corner of section 14. The relocation of the south boundary line of section 14 should be made by projecting a straight line from the identified original standard southeast corner of that section westward to the original identified standard, southwest corner of section 16. The point where that projected line will cross the line projected northward from the identified original standard quarter comer on the west line of section 23, to the nearest identified original standard corner or quarter corner, should be the southwest corner of section 14. In projecting these lines, of course, measurements should be made of the actual distances between the identified original standard corners thus connected, so as to distribute or apportion any discrepancies found between the actual measurements and the measurements shown on the original government survey. In that connection, too, the field notes should be observed Avherever practicable, so as to restore or relocate the lost or obliterated corners 'at the points where the government surveyor placed them, whether right or wrong. If the nearest identified original standard corner or quarter corner on a continuation of the line running northward from the identified original standard quarter corner on the west boundary line of section 23 is so far away' as to make it impracticable to connect' the two identified original standard corners or quarter corners, or if for any other reason it is impracticable to connect them with a straight line, the relocation of the west boundary line of section 14 will have- to be made by some other method to be adopted by the surveyors. But the record does not disclose that the method primarily required is impracticable. Any section corner or quarter corner that is identified as having been established by an official survey of the United States goA'ernment must stand as being correctly located, however plain it may appear that the location is wrong; because the government surveys cannot be changed in an action at law between individuals.
Inasmuch as one or the other of the two surveys made in this case is wrong and should be rejected, and inasmuch as the record does not furnish us a satisfactory reason for deciding which one should be rejected, we have concluded to remand the case to have another survey made, either by the four surveyors already commissioned or employed for that purpose, or by any other surveyor or surveyors whom the district judge may see fit to appoint. In making his report to the court each surveyor should cite the rule or rules followed, and give his reason therefor and for his not having followed some other appropriate rule or rules, if there be such. AVhen the two lost Or obliterated corners, the northwest corner and the southwest corner of section 14, shall have been relocated, the northwest corner of the S. AV. A4 of that section should be located equidistant from the re-established northwest corner and southwest corner of the section; and the southeast corner of the same quarter section should be located equidistant from the identified original standard southeast corner and the re-established southwest corner of the section. In like manner, of course, the N. AV. A4 of the S. AV. %, and likewise the N. y2 of that quarter quarter, and the AV. y2 of that N. %■ (being appellee’s lease), and the E. % of the- N. y2 of the same quarter, quarter *239 (being appellant’s lease), should be located. Our hope, in remanding the case, is that the surveyors will agree upon a method of relocating the two lost or obliterated standard corners of section 14, or that they will at least furnish us some good reason for which we may accept one and reject another of the surveys if the surveyors do not agree. The district judge has given no reason for accepting ont^ and rejecting the other survey, other than that, after a careful examination of the testimony, maps and proct's verbal of the surveyors, he was of the opinion that the survey made by the surveyors appointed by the court was correct. We must confess that the record does not furnish us a satisfactory reason for expressing an opinion as to which of the surveys is incorrect; and, knowing that either one or the other is incorrect, we cannot say that either is correct, without knowing that the other is incorrect.
The judgment appealed from is set aside, and it is ordered that this case be remanded to the district court for the making of a new survey, or of new surveys, and for further proceedings not inconsistent with the foregoing opinion.
The costs of the present appeal are to be borne by appellee; all other costs are to depend upon the final judgment.