VAUGHT, APPELLANT, *v.* McCLYMOND, RESPONDENT.

(No. 8453.)

(Submitted January 3, 1945. Decided January 29, 1945.)

[155 Pac. (2d) 612.]

544

Mr. *Robert C. Stong*, for Appellant, submitted an original and a reply brief.

Mr. *H. A. Simmons* and Mr. *Hubert A. Simmons, Jr.*, for Respondent, submitted a brief and argued the cause orally.

MR. JUSTICE ADAIR delivered the opinion of the court.

This action involves a boundary line between the lands of the plaintiff and those of the defendant and cross-complainant in section 26, township 4 south, range 24 east, M. P. M. Carbon county.

Plaintiff, Dorothy Vaught, is the owner of the north half of the southwest quarter and the southwest quarter of the southwest quarter and cross-complainant, J. R. McClymond, is owner of the northwest quarter of section 26. The boundary line in dispute is the dividing line between the two quarters. The parties admit that plaintiff owns no part of the northwest quarter and that cross-complainant owns no part of the southwest quarter.

Cross-complainant contends that an east and west fence, which he built eight days before the commencement of this action, marks the boundary line between his quarter section and that of plaintiff, while plaintiff contends that the fence is located on her land and 309.54 feet south of the north boundary thereof.

The accurate location of the true boundary line between the northwest quarter and the southwest quarter of section 26, as *created* and established by the official United States survey thereof, will be determinative of the controversy.

The section was officially surveyed in 1890 and thereafter, by patents dated August 13, 1914 and March 22, 1915, respectively, the United States granted to Samantha E. Vaught certain described tracts, including among others all the lands in the west half of section 26 that are now owned by plaintiff and cross-complainant. In the patents, after the description of the lands granted, appear the words ''according to the official plat of the survey of said lands returned to the General Land Office by the surveyor general.'' The patentee, Samantha E. Vaught, is the mother of plaintiff's husband, O. F. Vaught.

Commencing about 1914 the Vaught family farmed, as one unit, the land so granted including the west half of section 26 with no cross fence or other means of indicating the boundary line between the northwest quarter and the southwest quarter.

By deed dated October 22, 1940, there was conveyed to the cross-complainant, J. R. McClymond, the northwest quarter of section 26 ''containing 160 acres more or less according to the United States government survey thereof.''

About five months after he acquired title thereto, the cross-complainant engaged W. P. Burke, then county surveyor of

Carbon County, to ascertain the boundaries of the northwest quarter and by survey, made on March 12, 1941, Mr. Burke located what he then "considered" the boundary lines of the quarter.

Thereafter, on March 31, 1941, cross-complainant informed plaintiff's husband, O. F. Vaught, that he intended to build a fence across the west half of section 26 on a line given him by Mr. Burke as the south boundary of the northwest quarter.

The proposed fence line ran through a tract of land which, according to the testimony of Mr. Vaught, had been farmed by him since 1914 and on which there was then growing a crop of winter wheat planted by him in the fall of 1940. Mr. Vaught protested, contending that Mr. Burke's survey was in error; that it erroneously placed the south boundary line of the northwest quarter a considerable distance to the south of the true dividing line between the two quarters, and that the proposed fence would enclose and take from plaintiff a strip of her ground lying in the north half of the southwest quarter.

In August 1941, W. P. Burke, at plaintiff's request, made a second survey for the purpose of locating the boundary line between the northwest quarter and the southwest quarter. After making allowance for an admitted mistake in the starting point and calculations made therefrom, Mr. Burke's second survey located the center of the section 309.54 feet north of where it had been placed by his first survey.

On September 17, 1941, cross-complainant built a fence running east and west on the line given him by Mr. Burke's first survey as the south boundary line of the northwest quarter. Cross-complainant also demanded of plaintiff, as the landowner's share, one-fourth of all the wheat harvested from the strip of ground lying north of such fence.

On September 25, 1941, being eight days after the fence was built, plaintiff commenced this suit for restoration of the strip of ground; for damages for withholding and for the rents and profits thereof alleging that the strip comprises the north part

of the north half of the southwest quarter of which she is the owner.

By answer the defendant and cross-complainant, McClymond, admitted that he is the owner of the northwest quarter but denied the other allegations of the complaint and, by cross-complaint, alleged that about March 31, 1941, the plaintiff wrongfully entered into possession and ejected the cross-complainant from "The south 309.54 feet of the said Northwest Quarter of Section 26, Township 4 south, Range 24 east, M. P. M." The relief demanded was that plaintiff take nothing and that cross-complainant recover possession of the described strip of ground together with damages for the withholding and for the rents and profits thereof. Plaintiff's reply denied the allegations of the cross-complaint. The cause was tried to the court without a jury. Findings of fact and conclusions of law were made and filed and judgment rendered in favor of the cross-complainant, McClymond. By its findings and judgment, the trial court decreed the disputed strip of ground to be the south 309.54 feet of the northwest quarter and the boundary line between the northwest quarter and the southwest quarter to be the line indicated by Mr. Burke's first survey whereon cross-complainant had built his fence *after* this controversy arose.

The third finding of fact made by the trial court is to the effect, "That the true boundary line between said northwest quarter of said section 26 and said southwest quarter of said section 26 is on the line as alleged and contended by the defendant, J. R. McClymond, and as fenced by him on or about September 1, 1941."

Plaintiff has appealed from the judgment contending that the evidence fails to support the court's findings, conclusions and judgment as to the location of the boundary line and strip of ground in question.

The cross-complainant acquired and he holds the northwest quarter of section 26 "according to the United States government survey thereof." The deed of conveyance to him so specifies. When lands are granted according to an official plat

of a survey, the plat itself, with all its notes, lines, descriptions and landmarks, becomes as much a part of the grant or deed by which they are conveyed, and controls so far as limits are concerned, as if such descriptive features were written out on the face of the deed or grant itself. (*Pittsmont Copper Co.* v. *Vanina*, 71 Mont. 44, 227 Pac. 46; *Cragin* v. *Powell*, 128 U. S. 691, 9 S. Ct. 203, 32 L. Ed. 566; *Jefferis* v. *East Omaha Land Co.*, 134 U. S. 178, 10 S. Ct. 518, 33 L. Ed., 872; *United States* v. *Otley*, 9 Cir., 127 Fed. (2d) 988; *Ohlson* v. *Batterton, Mo.*, 230 S. W. 110; *Read* v. *Bartlett*, 255 Ill. 76, 99 N. E. 345. The original corners and lines of section 26 created and established by the government constitute the true and only boundaries of the designated quarter section. (*Goff* v. *Avent*, 122 Miss. 86, 84 So. 134; *Langle* v. *Brauch*, 193 Iowa 140, 185 N. W. 28.)

Congress has provided a system for the survey of public lands, and the boundaries and limits of the several sections and subdivisions thereof, including quarter sections, must be ascertained in conformity with the principles laid down in the federal statutes. (See Sections 751, 752, 43 U. S. C. A.)

Certified copies of the official plat as well as the field notes of the official government survey were received in evidence. They disclose that in 1890 the United States government caused a survey to be made of section 26 and the township of which it is a part; that section 26 is regular both in size and form, containing 640 acres and subdivided into four quarter sections containing 160 acres each; that the four corners of the section and the four quarter section corners were located at the time of the original survey and sand stone monuments of survey with appropriate markings thereon were set to mark each of the corners so located.

"A survey of public lands does not *ascertain* boundaries; it *creates* them." (*Cox* v. *Hart*, 260 U. S. 427, 43 S. Ct. 154 157, 67 L. Ed. 332.) "The quarter lines are not run upon the ground, but they exist, by law, the same as the section lines." (*Keyser* v. *Sutherland*, 59 Mich. 455, 26 N. W. 865, 867.) The location of corners and lines established by the government

survey, when identified, is conclusive (*Hickerson* v. *Dillard*, Mo. App. 247 S. W. 801) and the true corner of a government subdivision of a section is where the United States surveyors in fact established it, whether such location is right or wrong, as may be shown by a subsequent survey. (*Beardsley* v. *Crane*, 52 Minn. 537, 54 N. W. 740.) Original monuments of survey established during a government survey, when properly identified, control courses and distances (*Mitchell* v. *Hawkins*, 109 Neb. 9, 189 N. W. 175; *Langle* v. *Brauch*, supra) and field notes and an official plat of government surveys of record will control in ascertaining locations, even though the monuments established are gone. (*Slovensky* v. *O'Reilly*, Mo., 233 S. W. 478.) In ascertaining the lines of land or in re-establishing the lines of a survey, the footsteps of the original surveyor, so far as discoverable on the ground, should be followed and it is immaterial if the lines actually run by the original surveyor are incorrect. (*Ayers* v. *Watson*, 137 U. S. 584, 11 S. Ct. 201, 34 L. Ed. 803; *Galt* v. *Willingham*, 11 Fed. (2d) 757.) "In surveying a tract of land according to a former plat or survey, the surveyor's only duty is to relocate, upon the *best evidence* obtainable, the courses and lines at the same place where originally located by the first surveyor on the ground. In making the resurvey, he has the right to use the field notes of the original survey. The object of a resurvey is to furnish proof of the location of the lost lines or monuments, not to dispute the correctness of or to control the original survey. The original survey in all cases must, whenever possible, be retraced, since it cannot be disregarded or needlessly altered after property rights have been acquired in reliance upon it. On a resurvey to establish lost boundaries, if the original corners can be found, the places where they were originally established are conclusive without regard to whether they were in fact correctly located." (8 Am. Jur. Boundaries, Sec. 102, p. 819, Emphasis ours.)

The cross-complainant relies upon the accuracy of the two Burke surveys. The accuracy of the location of the line on which cross-complainant built his fence is dependent upon the

accuracy of the line run by the first Burke survey. That the strip of ground in controversy is 309.54 feet in width rests wholly upon the accuracy of the lines run and measurements ascertained by the second Burke survey and, if the second survey be accurate, then such strip of ground lies south of the east-west center line of the section and is the property of plaintiff.

The first Burke survey commenced and ended at a point which he *assumed* to be located on the west boundary line of section 26; his second survey began on the east township line and stopped at a point which he then "considered" to be the center of section 26, while the government survey of section 26 started from the corner common to sections 1, 2, 35 and 36 on the south boundary of the township thence north 0° 1' west between section 35 and 36, variation 18° 35' east, a distance of 80 chains, where was established and marked the southeast corner of section 26. In neither of the Burke surveys was any attempt made to follow the tracks of the government surveyors and the second Burke survey retraced none of the lines run by the first Burke survey. The Burke surveys fail to agree upon the location of the center of section 26 and obviously they neither coincide with each other nor with the government survey.

At the time he made his first (March 1941) survey, there was a fence running north and south along the westerly side of section 26 which Mr. Burke *assumed* was located on the west boundary of section 26. However he did not verify this *assumption* by checking with the government plat or field notes of the original survey and on such *assumed* line he found no original corners or monuments of survey as established by the government surveyors. The starting point of the survey was a stone set along the above fence which Mr. Burke *assumed* indicated the quarter corner and which he *assumed* "was on the center line of the east and west center line of section 26, on the west— north and south line."

The field notes of the original survey show that on the west exterior boundary line of the section the government surveyors "Set a sandstone 20 x 10 x 5 ins. 15 ins. in the ground for ¼

sec. cor. marked ¼ on W. face; dug pits 18 x 18 x 12 ins. N. and S. of stone 5½ ft. distant and raised a mound of earth 1½ ft. high 3½ ft. base alongside'' and that on the east exterior boundary line of the section the government surveyors ''Set a sandstone 20 x 12 x.4 ins. 15 ins. in the ground for ¼ sec. cor. marked ¼ on W. face; dug pits 18 x 18 x 12 ins. N. & S. of stone 5½ ft. dist. and raised a mound of earth 1½ ft. high 3½ ft. base, alongside.'' Mr. Burke located neither of the above monuments of survey set to mark the quarter section corners established by the government surveyors nor did he at any time attempt to locate the east and west center line of the section by running a straight line from the quarter section corner on the west boundary to the quarter section corner on the east boundary of the section.

Thus, without checking with any of the monuments of survey established by the government surveyors and without running any lines to locate either of the center lines of section 26, Mr. Burke commenced his survey by *assuming* at the outset that the stone which he found along the west fence, and which does not purport to be a government monument of survey, marked the quarter section corner.

Mr. Burke testified: ''Well, we found a stone set along the fence and that was marked, and it was on the center line of the east and west center line of section 26, on the west—north and south line. Then we measured a quarter of a mile north and found another corner. We continued there another quarter mile and found the northeast corner stone representing the northwest corner of section 26. There was three stones set there in that half a mile.''

Mr. Burke also testified: ''The line was established there by three corners being set from the center of section 26, on the west line, and the quarter corner 1,320 feet north; and another one set—another, 1320 feet north, northwest corner of section 26. Those corners were in—set and we checked the monuments.''

Again Mr. Burke testified: ''I surveyed the west line of the northwest quarter of section 26 beginning at the quarter corner

and going north to the northwest section corner and then running east a half mile, and then running south a half mile, and then running west a half mile. I run out to find the center of section 26, and then chained back from the center of section 26 to the point of beginning to be sure I had the full acreage staked out.''

To find the common corner of quarter sections or the legal center of a section of land, straight lines must be run from the quarter section corners on the boundary of the section to the opposite quarter corners, the point of intersection constituting the legal center, and the boundary line between two quarters cannot be legally established by measuring along one side of the section 160 rods, as Mr. Burke attempted to do in this case. (Sec. 752, 43 U. S. C. A.; *Poleske* v. *Jones*, 192 Iowa 1015, 185 N. W. 917; *Gerke* v. *Lucas*, 92 Iowa 79, 60 N. W. 538; *Phillips* v. *Hink*, 21 S. D. 561, 114 N. W. 699.)

As a starting point for his second survey made in August 1941, Mr. Burke used a brass-topped marker set on the east township line of township 4 south, range 24 east, M. P. M. In making this survey Mr. Burke erroneously *assumed* that the ''brass top'' marker had been set to indicate, on the township line, the corner common to the southeast corner of section 25 and the northeast corner of section 36. Some time after completing his survey, he discovered that his starting point was 309.54 feet south of the true corner common to sections 25 and 36. He testified: ''We found another marker at the northeast corner of 36, 309.54 feet north of the brass top. * * * It was designated by 5 marks on the south side. * * * We came back to the brass top corner 309 feet south of the stone corner and turned 90 degrees from that north and south line, using the brass top from there south as a sight, and ran a mile and a half west. I tied to the marker on the southeast corner of section 36. * * * We established a point a mile and a half west, and sighted back on the line on which we had just come, and turned a 90 degree angle north, and run another half mile. * * * We made the mark a half mile from the line we had run from the

east to the west and run a line down a half mile north." At this point Mr. Burke drove a lath in the ground, concerning which he testified: "Well, we will call it the center of section 26, *if the starting point from which we started was correct.*" Mr. Burke proceeded no further with his second survey but stopped at the point which he thus marked with the lath and which he stated he then "considered" to be the center of section 26.

Mr. Burke testified that at no time did he make a complete survey of township 4 south of range 24 east, M. P. M., nor did he at any time make a complete survey of section 26 thereof. He testified that in making his two surveys he did not consult the plat or field notes of the original government survey nor did he find or identify any monuments of survey, section corners or quarter section corners of section 26 originally established by the government surveyors.

The evidence shows that instead of searching for the original corners as established by the government surveyors Mr. Burke's first survey is tied into and largely dependent, for its accuracy, upon the accuracy of what purports to be a private survey of sections 22 and 27 and portions of sections 23 and 26 alleged to have been made in August 1911 by one A. B. Cooley. As evidence of the Cooley survey, the cross-complainant introduced in evidence as his exhibit B a purported original blueprint of the alleged survey. Mr. Burke testified that Mr. Cooley was formerly the county surveyor of Carbon county; that he considered him a competent surveyor and that at the time of the trial Mr. Cooley was dead. The witness was asked by the district judge as to his knowledge of whether Mr. Cooley had made the original blueprint, exhibit B, for the county or for private persons and the witness answered, "Apparently it was made for private purposes, because there is no record of it in the office." No field notes of the Cooley survey were introduced in evidence and there is nothing to show on what data or information the draftsman relied in making exhibit B.

Although Mr. Burke had no connection with, and personally

■ knew nothing about, the making by Mr. Cooley of the alleged 1911 survey, yet he was permitted to testify as to his interpretation of the lines and points shown on exhibit B. Such testimony is valueless as evidence. ''A surveyor's testimony is inadmissible except in connection with data from which he surveys, and testimony as to his location of a boundary line is incompetent where he has no means of verifying his survey.'' (11 C. J. S., Boundaries, sec. 107, p. 702.)

Exhibit B affirmatively shows on its face that Mr. Cooley failed to find the monuments of survey set by the government for the northeast and southwest corners of section 26 and that he did not relocate either of such corners; that Mr. Cooley disregarded and declined to follow or abide by the government marker for the northwest corner of section 26 found set on the east and west section line at a point 189 feet west of what he *assumed* was the north and south line between sections 22 and 27 on the west and sections 23 and 26 on the east; that Mr. Cooley disregarded and declined to follow or abide by the government marker for the southeast corner of section 26 found at a point 489 feet west of what Mr. Cooley *considered* to be the east boundary line of the section and 400 feet north of what he *considered* to be the south boundary line of section 26; that Mr. Cooley did not locate any government monuments of survey for any quarter corners of section 26 and that, without following the method prescribed by statute, he *assumed* to relocate a quarter corner on what he *assumed* to be the west boundary line of section 26, without first locating the true section corners as established by the government survey and without locating or setting any quarter corner markers on the north, east or south exterior boundary lines of section 26. It is from the ''quarter corner'' so set by Mr. Cooley on what he *assumed* to be the west boundary line of section 26 that Mr. Burke commenced his first ■ survey. ''An obliterated quarter section corner should be fixed as originally located. Lost quarter section corners, in regular interior sections should, under the generally accepted rules, be relocated on a straight line between the section corners

556

and equidistant therefrom, * * *." (11 C. J. S., Boundaries, sec. 13, p. 556.)

The cross-complainant owns land situate in section 27 which adjoins section 26 on the west and testimony was received tending to show that the line given him by Mr. Burke's first survey as the boundary line between the two west quarters of section 26 is in line with a fence running east and west through section 27. Where McClymond or others owning lands in section 27 built their fences could not possibly affect the location *according to government survey* of the true division line between the northwest quarter and the southwest quarter of section 26. (*Fairfield* v. *Barrette,* 73 Wis. 463, 41 N. W. 624.)

The Burke and Cooley surveys not only fail to conform to the official United States government survey of the lands in question but they also fail to comply with the laws and established rules governing the making of surveys to determine the boundaries and limits of lands conveyed and described according to the official government plat and survey thereof. (Secs. 751, 752, 43 U. S. C. A.; Secs. 4837 and 4842, Revised Codes 1935.)

It affirmatively appears that the private surveys upon which both plaintiff and cross-complainant rely were not made in accordance with the official plat, field notes, monuments of survey, lines, descriptions and landmarks made and established by the official government survey of the two quarter sections. For such reasons these surveys cannot and they do not furnish evidence of the location of the true boundary line between the northwest quarter and the southwest quarter of section 26 "according to the United States government survey thereof." The government survey conclusively fixes and controls the limits and boundaries of the two quarter sections involved and such limits, boundaries and corners, so established, may not be changed by the A. B. Cooley survey of 1911, by the W. P. Burke surveys of 1941, or by any other subsequent surveys. (*Fair* v. *Ida County,* 204 Iowa 1046, 216 N. W. 952; *Thompson* v. *Darr,* 174 Ark. 807, 298 S. W. 1.) The points where the government survey established the corners and set the monuments of survey

for section 26 must prevail over both course and distance and these points the Cooley survey and the Burke surveys failed to locate.

''Original corners, as established by the government surveyors, if they can be found, or the places where they were originally established, if they can be definitely determined, are conclusive on all persons owning or holding with reference thereto, without regard to whether they were located correctly or not, and must remain the true corners or monuments by which to determine the boundaries. Errors of location cannot be corrected by the courts, or by a surveyor called on to locate government corners and lines. A change in the location of a township corner by state, county, or other surveyors will not affect the location of a government quarter corner, in the absence of evidence that such quarter corner was actually established at some other point by the government surveyor, and even though the new township corner was also marked by the government surveyor, the quarter corner would not be changed in the absence of evidence showing the establishment of a quarter corner consistent with such new corner. The fact that the location of the corner in accordance with an inaccurate government survey will set awry the shapes of the sections and the subdivisions affected thereby does not affect the conclusiveness of the survey.'' (11 C. J. S., Boundaries, sec. 11, p. 552.)

''But the government surveys are, as a matter of law, *the* *best evidence;* and, if the boundaries of land are clearly established thereby, other evidence is superfluous and may be excluded; the *best evidence* is the corners actually fixed upon the ground by the government surveyor, in default of which the field notes and plats come next, unless satisfactory evidence is produced that the corner was actually located upon the ground at a point different from that stated in the field notes.'' (Emphasis ours. *Halley* v. *Harriman,* 106 Neb. 377, 183 N. W. 665, 668. See also *Lawler* v. *Rice County,* 147 Minn. 234, 180 N. W. 37; *Littlejohn* v. *Fink,* 109 Neb. 282, 190 N. W. 1020; *Sala* v. *Crane,* 38 Idaho 402, 221 Pac. 556.)

558

"Any section corner or quarter corner that is identified as ▮▮▮▮ having been established by an official survey of the United States government must stand as being correctly located, however plain it may appear that the location is wrong; because the government surveys cannot be changed in an action at law between individuals." (*Houston Ice & Brewery Co.* v. *Murray Oil Co.*, 149 La. 228, 88 So. 802, 805. See also *Thompson* v. *Darr*, supra; *Fair* v. *Ida County*, supra; Section 752, 43 U. S. C. A.)

Subsequent to the trial of this cause but some three months prior to the date of the filing of the court's findings, conclusions and judgment, the plaintiff served and filed a motion for the trial court to direct "the county surveyor of Carbon County, Montana, to make a survey of the boundaries between the lands of the plaintiff and defendant, said survey to be made according to the United States maps and field notes introduced as evidence at the trial of the above-entitled action and in accordance with such Government monuments as such surveyor may find which have been identified by the evidence given in this case." The motion was submitted upon briefs of counsel for the respective parties and by the trial court denied.

It is quite evident that, since the record contains no evidence showing that the line on which cross-complainant built his fence is situate on the true boundary line between the northwest quarter and the southwest quarter *according to and as created by the United States government survey thereof,* another survey, such as was contemplated by the above motion, must be made. (See *Houston Ice & Brewing Co.* v. *Murray Oil Co.*, 149 La. 228, 88 So. 802.)

The cross-complainant is entitled to all the lands embraced in the northwest quarter and the plaintiff to those embraced in the southwest quarter of section 26 according to and as shown ▮▮▮▮ by the United States survey thereof. "But to establish a practical location which is to divest one of a clear and conceded title by deed, the extent of which is free from ambiguity or doubt, the evidence establishing such location should be

clear, positive, and unequivocal." (*Beardsley* v. *Crane,* 52 Minn. 537, 54 N. W. 740, 742.)

In view of the state of the record in this cause, we have con-
■ cluded to remand the cause to have another survey made either by a surveyor or surveyors to be agreed upon by the parties, or by a surveyor or surveyors whom the district court may see fit to appoint. In running the boundary line between the northwest quarter and the southwest quarter, the government survey and official plat must control the action by any surveyor employed by the parties or appointed by the court to establish such dividing line. (*Stewart* v. *Boyd,* 15 La. Ann. 171.) The survey should be made pursuant to the statutes prescribing the rules regulating the survey of government lands and in accordance with instructions and regulations issued thereunder by the general land office for the guidance of county surveyors and others in ascertaining boundary lines created by the government survey and in relocating corners or monuments theretofore established which may have become lost or obliterated.

The judgment appealed from is set aside and it is ordered that this cause be remanded to the district court for the making of a new survey, or of new surveys, and for further proceedings not inconsistent with the foregoing opinion, each party to bear his own costs on this appeal.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES MORRIS, ANGSTMAN and CHEADLE concur.