IN THE MATTER OF THE APPLICATION OF R. W. MEYER, LIMITED, TO REGISTER AND CON-FIRM ITS TITLE TO LAND SITUATE IN MO-LOKAI, COUNTY OF MAUI, TERRITORY OF HAWAII.

NO. 2829.

ARGUED APRIL 17, 1952.                    DECIDED MAY 19, 1952.

LE BARON, J., AND CIRCUIT JUDGES CORBETT AND BROWN IN PLACE OF TOWSE, C. J., AND STAINBACK, J., DISQUALIFIED.

OPINION OF THE COURT BY LE BARON, J.

This is an action in the land court. The applicant is a Hawaiian corporation and claims a forty-one fifty-fourths (41/54) undivided interest in fee simple to certain lands on the island of Molokai as described in its application. The applicant's original source of title thereto is from Kalakauá, King of the Hawaiian Islands, who conveyed unawarded government lands, "situated at Kahanui in the

island of Molokai," to R. W. Meyer by two separate and distinct grants. The first is Royal Patent Number 3437, dated October 13, 1888, but subsequently canceled and a new patent of the same number substituted for it on October 29, 1889 to correct misspellings in the names of the two main valleys adjoining the land conveyed on its northern boundary. The new patent, hereinafter referred to as Royal Patent Number 3437, however, made no difference in the location of that boundary or in that of any other boundary, the new, in the same language and with identical sketch map attached as the old, describing that land and stating that it contains an area of 1048 acres more or less. The second grant is Royal Patent Number 3539, dated May 5, 1891, which, with sketch map attached, describes the land conveyed as beginning at a certain point on the northern boundary of Royal Patent Number 3437, extending north along center of ridge and containing an area of 20 acres more or less. Thus were conveyed government lands totaling an area of 1068 acres "more or less."

Two causes of action are alleged by amended application. In the first cause the applicant seeks to have its undivided interest registered and confirmed as an absolute title. The lands subject to that interest are referred to in such application as "all of Grant 3437 to R. W. Meyer and Grant 3539 to R. W. Meyer on a portion of Grant 3437 to R. W. Meyer," and as "containing an area of 1195 acres." The amended application alleges that the Territory is a tenant of the applicant on those lands by sufferance. In the second cause the applicant seeks to have its claim for rentals upon an implied contract adjudicated against the Territory. To the first cause of action, the Territory filed an answer which lays claim of title to an area in dispute of 50 acres within the area claimed by the applicant. It alleges that applicant's map inaccurately depicts the boundaries described by Royal Patents Numbers 3437 and

3539 and inaccurately depicts the topography of the lands conveyed and of Waihanau Valley so as to include a portion of Waihanau Valley within the lands conveyed, which portion is a part of the adjoining land of the Makanalua and constitutes the area in dispute. It further admits that the "applicant is the owner in fee simple of an undivided interest in the land[s] sought to be registered in this proceeding, excepting and excluding therefrom the disputed area which is owned by the Territory of Hawaii," but denies that the Territory is a tenant by sufferance, alleging that it is only "occupying the disputed area above described by virtue of its own right as owner." To the second cause of action the Territory filed a demurrer. But that demurrer was not considered below, the issues raised by it to the second cause of action being reserved for future determination until a time after the issues raised by the answer to the first cause of action had been finally determined. Nothing concerning the second cause of action, therefore, is before this court for appellate review. The first cause of action alone was tried below.

The sole issue before the land court for determination by stipulation of the parties was the location of the middle western portion of the northern boundary of Royal Patent Number 3437, the locations of the extreme western and the eastern portions of that boundary, as well as those of the entire eastern, southern and western boundaries not being in dispute but admittedly established by the description in the grant, consistent with prior existing government surveys and maps. That issue required the land court to interpret the language of the call for the western portion of the boundary between the agreed point certain on the extreme northwestern tip of Royal Patent Number 3437 and that designated as triangulation point "A," to the southeast on the northern boundary thereof, where the center ridge line of Royal Patent Number 3539 joins that boundary at the

edge of Waileia Valley. Such language calls for a meander line commencing with "a stone marked with a cross at the edge of Waihanau Valley thence around the head of the Waihanau" Valley to "A" as the southeast point above set forth. Over the objection of the Territory, the land court on such issue admitted parol or extrinsic evidence of ancient boundaries on the theory that Royal Patent Number 3437, as well as the other patent, constituted a grant "by name only." On that evidence, it in effect interpreted the language of the call to mean a portion of boundary "as known and used from ancient times" and determined the intention of both patents to convey, not according to surveyed descriptions, but according to ancient boundaries. It therefore found that the language "at the edge of Waihanau Valley thence around the head of the Waihanau" Valley described an ancient boundary, as depicted in the amended application, so as to include the disputed area. Consistent therewith, the land court entered a decree sustaining the applicant's claim of title to the disputed area and denying that of the Territory.

The Territory relies upon eight specifications of error covering its thirty-eight assignments of error. No useful purpose would be served by setting them forth. Suffice it to say that they challenge, *inter alia,* the description in the amended application depicting the middle western portion of the northern boundary of Royal Patent Number 3437 and the adoption of it by the land court; the admission of parol or extrinsic evidence to prove that such portion constitutes an ancient boundary; the underlying theory of the land court's finding that the intention thereof was to convey, not according to surveyed descriptions based upon existing government surveys and maps, but according to ancient boundaries in disregard of such descriptions; and its failure to properly apply the language of the call for such portion of the boundary to the ground, as well as to

limit the inquiry of trial to a following of the steps of the government surveyor who made the actual survey and maps for the government before the unawarded government land was conveyed by Royal Patent Number 3437, as indicated by those surveys and maps and by the supporting field notes of the government surveyor. Those specifications, however, present before this court the same issue of location and require it to interpret the same language of the call for the middle western portion of the northern boundary of Royal Patent Number 3437 as presented and required below.

The applicant does not seriously argue before this court that either royal patent constitutes a grant "by name only," even though the theory that both of them did is the essential basis of the decree from which the Territory sued out the instant writ. Indeed, it could not do so with cogent reason. Admittedly, both patents are of the same character of grant. The call to be interpreted, however, is in Royal Patent Number 3437 and only the character of that patent need be considered. The land conveyed thereby, being government land of more than three hundred dollars in value, was required by statute not only "to be correctly surveyed" before it was sold but to be sold "at public auction," the survey likewise being required to "be kept in the office of the Minister [of the Interior], open to inspection of any one who may desire to examine the same." (Haw. Comp. L. 1884, §§ 47, 42, sub-par. 1.) Compliance with these statutory requirements constituted a prerequisite of sale. That prerequisite was fully met. Thus, the land was actually surveyed in 1885 by the government surveyor, one M. Douglas Monsarrat, now deceased, who made extensive field notes. His survey and field notes, together with four official government surveys and maps made in accordance with them, were filed and registered with the office of the Minister of the Interior in 1886 and since that time have

remained public records in the files of the government. As already indicated, the patent issued in 1888 and reissued in 1889. It describes the land by metes and bounds and by other calls consistently with those surveys and maps. Fastened between its pages is a sketch map as a part of the patent on its face. That map clearly outlines the shape of the land conveyed and portrays the courses of its boundaries. It indicates not only the commencing point of survey but other government survey stations on the boundary lines of the land conveyed. It also shows the location of adjoining lands, inclusive of the upper ends of the valleys bordering from the north. Moreover, such map is on the same scale as a corresponding government survey and map of 1886, so that tracings of one would substantially coincide with those made from the other.

The patentee was fully aware of the character of Royal Patent Number 3437 as a grant by surveyed description and map in contradistinction to one "by name only." He himself was a surveyor. It was he who advised the government by letter that "M. Douglas Monsarrat surveyed this piece of land" and enclosed with his formal application for the patent Monsarrat's surveyed description of it. After purchasing that land at public auction and after issuance of the patent in 1888, the patentee claimed that an additional piece of land should have been included. But he was reminded by the Minister of the Interior that "the sale was made by a map and detail description both made by Mr. M. D. Monsarrat, excluding the piece which you claim." In response to that reminder he conceded that "it would be illegal to add anything to a Royal Patent for a piece of land sold by survey" and he merely had misspellings corrected by a reissuance of the patent. Thereafter he applied for and purchased the piece claimed by him as the ridge land adjoining the northern boundary of the patent at point "A," which would have been unnecessary had the

patent been a grant "by name only" so as to include within its ancient boundaries that piece. He thus acted consistently with the obvious character of the patent, which on its face manifested the grant's intention to convey land according to the surveyed description and map contained in the grant, there being no intention to convey land according to what had been "known and used from ancient times."

The determinative source of the surveyed description and map as parts of Royal Patent Number 3437 on its face was the reservoir of official surveys and maps, as well as supporting field notes, filed and registered in the office of the Minister of the Interior where the patent was prepared. Indeed, compliance with the statutory requirements of prior survey and of public record of that survey not only constituted a prerequisite of sale but by necessary implication indicates that the sale was made and the patent drawn in conformity with such survey. Resort, therefore, may be had to that public record, as well as to the other public records substantiating it, for the purpose of controlling the calls in the grant. Those public records are to be construed with the grant should it require construction. (See *Newman* v. *Foster*, 3 How. [U.S.] 383, 34 Am. Dec. 98; *Steele* v. *Taylor*, 3 A. K. Marsh [Ky.] 225, 13 Am. Dec. 151; *Vaught* v. *McClymond*, 155 P. [2d] 612 [Mont.]; *Lyon* v. *Fairbanks, et al.*, 79 Wis. 455, 48 N. W. 492.) But no construction is required of the grant, which admittedly is a valid conveyance without any patent ambiguity appearing on its face. Consistent with the excellent reputation of the government surveyor as the outstanding surveyor of his time in the Hawaiian Kingdom, the grant contains no errors or mistakes to be corrected and gives rise to no latent ambiguities when its language is applied to the ground.

The crux of the case concerns the location of a portion

of boundary, rather than a construction of the grant, and involves the admissibility of parol or extrinsic evidence. Upon that crucial point this court has authoritatively declared. the settled law to be, where, as here, there is no ambiguity, that "parol evidence is inadmissible to vary or contradict the terms of the grant." (*Ookala S. Co.* v. *Wilson,* 13 Haw. 127, 131.) It further likewise declared that "It is also settled that parol evidence is admissible when the question is one of location as distinguished from one of construction, that is, such evidence is admissible to connect the land with the grant or to apply the grant to the land." (*Ookala S. Co.* v. *Wilson, supra.*) These principles, simply stated, are decisive of the solution of the problem before this court, the objective being to give effect to nothing else but the grant's intention to convey land according to its surveyed description and map.

Within those principles, parol or extrinsic evidence was properly employed to locate all the boundaries of Royal Patent Number 3539. Illustrative thereof, the applicant applied to the ground not only the language of the grant for a surveyed line along the center of a ridge but a more definite survey of the land itself by the government surveyor on file with the government, presumably as a part of the grant, and readily located the boundaries of the land conveyed. The natural monument descriptive thereof was found by that process to be the continuous contour line of the entire eastern edge of Waihanau Valley and of the entire western edge of Waileia Valley as parallel valleys between which the ridge extended to the north from point "A" on the northern boundary of Royal Patent Number 3437.

Within the same principles, parol or extrinsic evidence was properly employed to locate all the boundaries of Royal Patent Number 3437 except the middle western portion of its northern boundary, the location of that portion being in

dispute. Illustrative thereof, the applicant applied to the ground the language of the grant for the extreme western portion and for the eastern portion of the northern boundary and readily located those portions. Likewise, the entire eastern boundary of Royal Patent Number 3437 was located. The language of the call for the eastern boundary is comparable to that for the northern. It calls for a meander line commencing with the eastern terminal point of the course for the northern boundary at the edge of Waikolu Valley "thence along the edge of Waikolu Valley to initial point," also on the edge thereof. The natural monument, descriptive of and common to the extreme western and eastern portions of the northern boundary and the entire eastern boundary, was found by that process of application to be the contour line of continuous mountains meandering along the edges of the respective three adjoining valleys similar to that surrounding the ridge land of Royal Patent Number 3539. In this connection, the Territory had no difficulty in applying the language of the call for the western portion of the northern boundary of Royal Patent Number 3437 to the ground. In doing so, the natural monument descriptive of the middle western portion of that boundary was found to be a continuation of the contour line connecting the extreme western portion with the eastern portion thereof and common to the boundary as a whole. Indeed, any competent surveyor, even without the aid of the government surveyor's field notes, would have had no difficulty in so locating such middle western portion of the northern boundary by the same process. This is indicated by the topography of Waihanau Valley, to which the language of the call is directed with respect to the edge and head of that valley.

To appreciate that topography and to understand that call, the ordinary and usual meaning of the word "valley," the word "head" and the term "around the head" of a valley

must be borne in mind so that the language of such call may be properly applied to the ground. The pertinent definition of a valley in Webster's dictionary is "an elongate depression * * * between bluffs, or between ranges of hills or mountains." That of a head is "the end of anything regarded as the upper end, through being higher, being associated with the head of a person, being opposite to the foot, or any like association of ideas; as the head of a * * * valley * * *." The term "around the head" of a valley denotes a line of curvature with its apex at the topmost part of the upper end of the valley. It has the same meaning as that of the term "along the edge" of a valley, when limited to the upper end, and has a comparable meaning to that of the term "around the shoulder" of a valley or other protruding parts thereof.

Waihanau Valley is "an elongate depression * * * between * * * mountains." Its foot is to the north toward the sea and its head to the south toward the center of the island, the head being "the upper end, through being higher." Its floor, down which runs a stream, progressively ascends in elevation but the mountains creating the definitive depression remain fairly constant at an elevation of 2600 feet on the western edge and 2700 feet on the eastern. When the parts of that valley are depicted by an association of ideas to corresponding parts of a person the wide depression between the mountains before they commence to converge may be termed "the body"; the adjoining narrowing depression as those mountains converge may be termed "the shoulders"; the adjoining long gorge where those mountains converge and run almost parallel to each other may be termed "the neck"; and the adjoining wider and shorter ravine where those mountains diverge at the southern end of the gorge and then reconverge at the southern edge of the valley may be termed "the head." By like association of ideas, the crown or topmost part of the head may be placed

at the point where the mountains reconverge by an overlapping of ridges at an "S bend" of the stream bed so as to virtually terminate the definitive depression, except for the stream bed, the contour lines of those ridges being at the elevation of 2400 feet at the center point of overlap, which is the southern edge of the valley at the crown of its head. Thus, the entire edge of the valley forms a hairpin loop with an elevation of 2600 feet on the western side of the valley, one of 2400 feet on its southern side and one of 2700 feet on its eastern.

The language of the call for the western portion of the northern boundary of Royal Patent Number 3437 demands that it be interpreted objectively in relation to the physical features of Waihanau Valley so that every word be given significance. When this is done the meaning is plain and signifies a meander line commencing with "a stone marked with a cross at the [western] edge of Waihanau Valley thence [curving along that edge in a southerly direction to the topmost part of the valley's upper end] around the head of Waihanau" Valley and thence east to point "A." That language, so interpreted, calls for a single meander course which is southeast, south and east and within which are confined the necessary turns and windings of the valley's edge.

Strongly corroborative of that meaning as the true interpretation of the language of the call for the western portion of the northern boundary is the sketch map as a part of the grant itself. That map portrays the same meander course for that portion of boundary and, without dispute, does so correctly for the extreme western portion of the same boundary, as well as for the eastern portion. In further corroboration thereof, the official government surveys and maps all identify the same meander course of the same boundary and may be resorted to for the purpose of controlling the call for that boundary. On one of them the

government surveyor, in his own handwriting, marked the letter "K" as a triangulation point upon that course. That point is admittedly located with certainty in his field notes by being twice coordinated with different government survey stations and other fixed points. It therefore further not only identifies the same meander course but controls the call for the boundary along that course. Nor is there anything to the contrary to be found in the grant or in those public records. Thus, the single meander course is identified with absolute certainty as one along which runs the western portion of the northern boundary. Such identification operates to amplify the meaning of the language of the call for that portion as interpreted by this court. No other meaning suffices to meet the grant's intendment. That meaning therefore governs the location of that portion as to course. Consistent therewith, the answer of the Territory correctly describes and locates such portion and in doing so properly excludes the disputed area from the land conveyed by Royal Patent Number 3437.

Needless to say, the amended application of the applicant contradicts the meaning of the language of the call for the middle western portion of the northern boundary of Royal Patent Number 3437 as interpreted by this court. In doing so, the amended application not only contradicts but varies the terms of the grant itself, so as to add the area in dispute to the land conveyed, and thereby violates the grant's intention and encroaches upon the land of the Territory. This the applicant accomplished by ignoring the sketch map's portrayal of the single meander course for the entire western portion of the northern boundary as a part of the grant, by refusing to be guided by official government surveys and maps or to follow in "the footsteps" of the government surveyor, and by improperly applying the language of the call to the ground. Illustrative thereof, the applicant in its amended application creates four

courses out of the single meander course by departing due north from the western edge of Waihanau Valley at a point it arbitrarily fixed, which is short of point "K" further southeast along such edge, so as to go down its side for a depth of four hundred feet at the base of its head to the floor of the valley, where are several spectacular big waterfalls, then up the opposite side of the valley to its eastern edge for a height of six hundred feet and then along that edge due south to point "A." Applicant's excuse for so cutting off the head of the valley is premised solely upon parol or extrinsic evidence. That evidence consists of the testimony of various witnesses, the correspondence between the patentee and the Minister of the Interior, letters of Monsarrat and other documents. It deals generally with ancient boundaries and specifically with the big waterfalls. It tends to prove, assuming without deciding such probative tendency, that the top of those falls has been considered "since ancient times" to be the head of Waihanau Valley as a natural monument descriptive of an ancient boundary and was used and regarded by the patentee for the purpose of marking the middle western portion of the northern boundary of Royal Patent Number 3437.

Although the law is well settled that parol or extrinsic evidence is admissible to locate and explain natural monuments descriptive of the land conveyed, no citation of authorities is necessary to say that such evidence is inadmissible to locate and explain any object not descriptive thereof. Moreover, the test of whether an object be such a natural monument so as to mark a boundary of the land conveyed is that it must be connected with that land. The parol or extrinsic evidence relied upon by the applicant does not meet that test. It pertains to the object of the big waterfalls but does not connect that object with the land conveyed. Nor do the surveyed description and map as parts of the grant, the official government surveys and

maps and the work of the government surveyor, none of which describes such object to mark a boundary of the land conveyed. The evidence so relied upon therefore has no probative value or force to prove anything descriptive of the middle western portion of the northern boundary of the land covered by Royal Patent Number 3437. (See *Vireca Corporation* v. *Cole, et al.,* 129 S. W. [2d] 433 [Tex. Civ. App. 1939].) Nor does that evidence purport to locate and explain any monuments, natural or artificial, which are descriptive of such portion. On the contrary, it completely ignores them, as well as their locations. It does so by radically departing from the well-established and easily ascertainable single course of boundary and by substituting for the descriptive monuments along that course the big waterfalls located elsewhere. This attempt to supplant a course of boundary and to displace descriptive monuments upon it is beyond the permissible limits of parol or extrinsic evidence, otherwise boundaries delineated by surveyed description and map could always be disturbed. In short, the evidence relied upon by the applicant goes outside the land conveyed by grant on surveyed description and map, in contradiction of and at variance with the terms of the grant itself. It therefore is inadmissible and constitutes no valid excuse in law or in fact, either for the applicant to claim the area in dispute or for the patentee to have used and regarded, if he did, the big waterfalls for the purpose of marking any portion of boundary for the land conveyed by Royal Patent Number 3437.

The decree of the land court is reversed and the cause remanded below with instructions to order the applicant to amend its amended application by striking out the disputed area, in lieu of an order dismissing such application, and for such further proceedings as may be consistent with this opinion.

*T. W. Flynn,* Special Deputy Attorney General (*W. D.*

*Ackerman, Jr.*, Attorney General, and *T. W. Flynn,* Deputy Attorney General, on the briefs), for plaintiff in error.

*P. Cass* (*S. Shapiro* with him on the brief) for defendant in error.