79 So.2d 356 (1955)
Walter Harlan BEENE et al., Arkansas Fuel Oil Corporation, Intervenor, Plaintiffs-Appellees,
v.
T. B. PARDUE et al., Defendants-Appellants.
No. 8038.
Court of Appeal of Louisiana, Second Circuit.
March 22, 1955.
Rehearing Denied April 14, 1955.
Writ of Certiorari Denied May 23, 1955.
*357 Hussey & Smith, Bullock & Bullock, Shreveport, for appellants.
W. S. Waller, W. M. Phillips, George Conger, H. C. Walker, Jr., Robert Roberts, Jr., Gilbert Hetherwick, Shreveport, for appellees.
AYRES, Judge.
The plaintiff, William Harlan Beene, as the owner of an oil, gas and mineral lease covering the NW¼ of the SW¼ of Section 33, Township 21 North, Range 15 West, Caddo Parish, Louisiana, except an oil well situated thereon known as Arkansas Fuel Oil Company's No. 8 instituted this action against T. B. Pardue, as the owner of that part of the SW¼ of the NW¼ of said section, township and range lying east of Black Bayou Canal, and J. C. Trahan, Trans-Gulf Corporation and Weaver-Perry Oil Corporation, as owners of oil, gas and mineral leases or over-riding royalty interests in said property, for the purpose of having judicially determined the boundary between said properties. The Arkansas Fuel Oil Corporation, as the owner of the first described tract, intervened and joined with the plaintiff in seeking the relief prayed for by plaintiff. It is alleged that said boundary is obscure and uncertain and has never been fixed judicially nor by private survey, and that amicable demand for the ascertainment of said boundary was made by plaintiff and refused by defendants. Wherefore, it was prayed that a qualified surveyor be appointed to make a survey of the aforesaid lands, ascertain their limits and make a process verbal thereof in accordance with law, after which there be judgment fixing the boundary between said properties.
Alleging the existence of a visible, established and recognized boundary between said tracts for a period exceeding 30 years, acquiesced in by the owners thereof during *358 said time, the defendants filed pleas of prescription of 10, 20 and 30 years, and particularly alleged "* * * that the NW¼ of SW¼ and the SW¼ of NW¼, Section 33, Township 21 North, Range 15 West, Caddo Parish, Louisiana, have been physically separated by a fence, a road and a levee for more than 30 years, which visible bounds the present owners of said tracts of land and their authors in title have continuously and without interruption recognized and acquiesced in for more than 30 years as the boundary line between their respective properties, having actually and physically, openly, peaceably, continuously and without interruption possessed, as owners, for that period of time, in excess of 30 years, the properties in question up to said visible bounds".
The plea of prescription was first tried in the district court and overruled, for reasons stated by the court as follows:
"The plea of prescription was overruled because the Court found that there has never been a fixing of the boundary by agreement or by extrajudicial survey and that the two tracts had not been separated by a visible boundary for thirty years or more."
Thereafter, Ben E. Ramsey, a registered surveyor, was appointed by the court to make a survey of the properties in dispute and to locate the boundary between them. Accordingly, the survey was made and a plat and process verbal thereof were duly returned to and filed in court. Defendants urged the acceptance and homologation of said survey, which was objected to by plaintiff and intervenor as being inaccurate and erroneous and not clearly locating the boundary between said lands. After trial of the issues thus presented, Ramsey's survey was rejected and the survey introduced by plaintiff and intervenor made by S. D. Armstrong, another registered surveyor, was approved and accepted. Judgment was accordingly rendered and signed approving the boundary as located by Armstrong, who was ordered to affix suitable markers or monuments for the identification of said boundary line.
From the judgment thus rendered and signed, defendants, T. B. Pardue and Weaver-Perry Oil Corporation, appealed. The other defendants have neither appealed nor made any appearance in this court.
This court's appellate jurisdiction of the subject-matter of this litigation has been conclusively determined heretofore. 223 La. 417, 65 So.2d 897; La.App., 67 So.2d 337; 226 La. 606; 76 So.2d 902.
The pleas of 10 and 20 years' prescription have been abandoned by defendants as inappropriate and inapplicable. The issues remaining concern the questions, first, whether said properties have been physically separated by visible bounds recognized and acquiesced in for more than thirty years by the owners of said lands and, second, the correctness of the judgment rejecting Ramsey's survey and accepting that of Armstrong.
The approximate 1100 pages in the transcript of this case have received our most careful and painstaking consideration. Our labors, however, have been greatly minimized by the thorough and exhaustive briefs of counsel and the written opinion of the trial judge.
The evidence establishes that during the early 1900's J. W. Dixon owned the entire Section 33, Township 21 North, Range 15 West, Caddo Parish, Louisiana; that between 1904 and 1906 he caused to be erected a net and barb wire fence running east and west entirely across said section but somewhat south of the east and west center line thereof. The north portion of this tract was under cultivation; the south portion was low, wooded land. The fence was constructed not for the purpose of serving as a boundary between two estates, as, in effect, only one estate existed at the time, but for the purpose of protecting crops from roaming livestock. It could not be concluded, therefore, that it was initially intended that the fence serve as a boundary. By separate deeds dated April 14, 1910, Dixon sold the south half of the section to John M. Robinson and George W. Robinson and the north half to the Louisiana Gas *359 Company, and through said vendees, as their authors and predecessors in title, the present owners acquired title to the portions of said property as hereinabove described and as involved in this litigation. In all the conveyances in the chains of title down to the present owners, the properties were sold by governmental subdivisions; no mention was ever made anywhere of any fence or other visible boundary. Other than as to a section of approximately 300 feet on the west side of the said NW¼ of the SW¼, it was not disclosed that the fense was ever repaired or maintained by subsequent purchasers of either tract. Through the lapse of time, lack of repair and by action of the elements, the fence rusted and deteriorated and its original purpose was terminated by the enactment of stock laws.
Although the exact date was not shown, during the 1920's, a small levee was constructed in the vicinity of but slightly north of the aforesaid fence but only partially across the disputed lands, and, at the same time, the remains of the fence were torn down and destroyed other than for a short distance on the west side. This levee was some 4 to 6 feet in height at its eastern end and gradually decreased to ground level as the grade inclined to the west. This levee was constructed for the purpose of keeping backwater off of the then cultivated portion of the property. Defendants contend that the levee replaced the fence as one of the visible bounds. Although in a different manner, both fence and levee were intended for the protection of the farm land and the growing crops. There was a slight variation in location of the fence and levee. The levee, like the fence, was not maintained. The necessity of a fence as a protection from roaming livestock ended with the passage of stock laws; the necessity for the levee no longer existed after the construction by the Caddo Parish Levee Board of a large protection levee across these lands near their western boundaries. This construction was undertaken about 1938-1940. Between the parish levee and the western end of the small levee is a space of a few hundred feet over which there are no markings of physical separation of the land to the north from that of the south other than what defendants contend is a road. This, however, is not a public road, as specified in LSA-C.C. art. 828. At the most, this was a mere passage over which access was had to the properties and to the wells thereon. The photographs filed in the record not only show that the "road" was not in a continuous straight line with the levee but also that the "road" lacked permanency in its location, which was changed and shifted, apparently at the will of the parties using the same. As was the case with the fence and levee, so it is with the so-called road, which was not shown to have taken the same location as the fence. This road has never been maintained nor repaired by any public authority. A borrow pit was formed in the construction of the protection levee by the Caddo Levee Board across the western extremity of the property herein involved. Across this pit was a fill or cross-lay forming a part of the road or passage heretofore referred to, allegedly constituting a portion of the boundary between the properties. This passageway was located north of the old fence, as was the levee constructed near the dividing line of said estates. We do not think, under the evidence adduced, that the so-called road could serve as a boundary.
The owners of contiguous estates or lands have the right to have their boundaries determined under the conditions specified in LSA-C.C. art. 823, which reads as follows:
"When two estates or lands contiguous, in cities or in the country, have never been separated, or have never had their boundaries determined, or if the bounds, which have been formerly fixed, are no longer to be seen, each of the owners of the contiguous estates has a right to compel the other to fix the limits of their respective properties."
While the action of boundary is imprescriptible, LSA-C.C. art. 825, if the owners of contiguous estates or those from whom they have acquired have recognized *360 and acquiesced in a boundary between such estates for a period of 30 years or more, then this boundary will be accepted in preference to an ideal boundary.
In construing LSA-C.C. art. 852, which reads as follows:
"Whether the titles, exhibited by the parties, whose lands are to be limited, consist of primitive concessions or other acts by which property may be transferred, if it be proved that the person whose title is of the latest date, or those under whom he holds, have enjoyed, in good or bad faith, uninterrupted possession during thirty years, of any quantity of land beyond that mentioned in his title, he will be permitted to retain it, and his neighbor, though he have a more ancient title, will only have a right to the excess; for if one can not prescribe against his own title, he can prescribe beyond his title or for more than it calls for, provided it be by thirty years possession,"
the Supreme Court in Opdenwyer v. Brown, 155 La. 617, 624-626, 99 So. 482, 484, stated:
"That where a tract of land had been possessed under visible bounds for 30 years, such visible bounds should prevail over the ideal bounds called for in the titles.
* * * * * *
"It is our firm conviction that the public interest requires that boundaries established for more than 30 years should not be disturbed; and we think the law so provides."
Boundary is defined by LSA-C.C. art. 826 thus:
"By boundary is understood, in general, every separation, natural or artificial, which marks the confines or line of division of two contiguous estates. Trees or hedges may be planted, ditches may be dug, walls or inclosures may be erected, to serve as boundaries.
"But we most usually understand by boundaries, stones or pieces of wood inserted in the earth on the confines of two estates."
In the sentence, "Trees or hedges may be planted, ditches may be dug, walls or inclosures may be erected, to serve as boundaries", the phrase "to serve as boundaries" is important and significant. Unless the objects allegedly constituting a separation of the estates are actually intended as a boundary or have at some time begun to be recognized as a boundary, they cannot serve for such purpose. It has been held that strong proof is required to show that the boundary line had been changed by mutual consent between two former owners from where it would otherwise be located by government survey. Simmons v. Miller, La.App., 170 So. 521, 524. The burden is, therefore, upon the party claiming a departure from the governmental survey to establish his contention by clear, unmistakable and convincing proof.
Defendant Pardue acquired his lands in 1932. Apparently all former proprietors are deceased and there is no direct and positive evidence as to their intentions in the erection of the fence, the construction of the levee and the use of the passageway westward from the levee. At the most, their purposes, intention and understanding could only be surmised. It would appear, however, that in the construction of the fence, inasmuch as he owned the entire section, Dixon had no intention of dividing or separating two estates.
If it was later determined that the fence constituted a boundary between the estates, it is not shown definitely when it began to be so recognized or acquiesced in as such. In this connection, in Broussard v. Winn, La.App., 41 So.2d 486, 490, the Court of Appeal for the First Circuit, through Judge LeBlanc, later Associate Justice of the Supreme Court, as the author of the opinion, relative to the priority of the ideal boundary in a government survey over a visible boundary in the form of an old fence, stated:

*361 "The determining question therefore is whether or not the plaintiff, who has the burden of proof, adduced sufficient testimony to show that the fence has been in existence and recognized as the boundary for the stated period of time."
The general rule is that it is not sufficient that one party merely permit or suffer another party to build a fence or other obstacle upon his land. To constitute a boundary, it must be clearly understood to be so. For instance, 8 Am.Jur., Page 805, "Boundaries", Sec. 82, states:
"Moreover, a fence may be maintained between adjoining proprietors for the sake of convenience merely, and without intention of thereby fixing boundaries, in which case mere acquiescence by adjoining landowners in its existence and the occupancy of the land on either side of it do not, in themselves, constitute proof that it is on the accepted boundary line so as to constitute it a boundary."
An observation appropriate here was made by the Supreme Court in Williams v. Bernstein, 51 La.Ann. 115, 124, 25 So. 411, 415:
"The mere fact that parties owning adjoining property have cultivated lands up to a certain line, or up to a certain fence, built either by one or by both, or built by one and repaired by the other, does not per se evidence an adverse possession up to the line or fence, or an acquiescence in or recognition of an adverse ownership. Neighbors constantly run up fences within or beyond the boundary lines, and join their fences, doing so with the knowledge and understanding that such acts are merely temporary, and done subsidiarily to, and with reference to, the right of both to ultimately ascertain and fix rights by an action of boundary, or through a formal, legal survey. Until this happens, the lands held by each are in the occupancy, and not in the adverse possession, of either,certainly so in the absence of a clear and direct claim advanced of adverse ownership and possession. In the absence of such a claim, the other party is justified, inasmuch as matters as to boundary are resting in abeyance, subject to future adjustment through an action of boundary. * * * Plaintiff would have the right to assume that defendant's possession, if such it could be termed, was by sufferance, precarious, and subsidiary to the adjustment of the exact legal rights of the parties, to be ultimately ascertained and fixed by an action of boundary."
In Hester v. Smith, La.App., 72 So.2d 549, 551, in holding that the evidence of defendants was insufficient to warrant the finding of the establishment of a boundary line by mutual consent of the owners of the contiguous estates, this court, through Judge Hardy as the author of the opinion, stated:
"The testimony in the record is not so much significant by reason of the facts established as for the failure to establish the one essential, namely that the 1902 fence was agreed upon, accepted as and intended to represent the boundary between the Hester and Smith estates. Careful and repeated examination of the testimony which may be regarded as bearing upon this point only serves to emphasize this failure. It is quite true that a number of the witnesses consistently referred to the 1902 fence as the boundary; that the widow of W. P. Smith who had lived on the Smith property from 1893 to 1943, a period of fifty years, testified that Smith and Hester built a wire fence about or between 1900 and 1902 between their properties, but we find not the slightest direct and positive evidence that this 1902 fence was intended by Walter S. Hester and W. P. Smith to mark the boundary between their estates. There is some testimony that the immediate purpose of the fence was to keep the cattle separated, but we are not concerned with the assignment of any definite *362 reason nor the finding of any exact purpose, other than the intention of marking a boundary.
"In the determination of boundaries we think the intention of the parties is an essential requirement. This principle appears to be well established; Sharpless v. Adkins, La.App., 22 So.2d 692, certiorari denied; Dufrene v. Bernstein, 190 La. 66, 181 So. 859, and cases cited therein.
"We must therefore conclude that the first ground for the defense has failed. Irrespective of the existence of evidences of remains and vestiges of an old fence, even conceding that these are evidences of the 1902 fence, in the absence of an agreement or understanding evidencing the intent of the parties to accept this line as a boundary, the contention must fail."
In Jones v. Dyer, La.App., 71 So.2d 648, an action in boundary, wherein defendants urged the prescription of 30 years, contending that a fence formed a visible boundary and was recognized as such for the required time, the evidence disclosed that the location of the original fence could not be clearly determined for the reason that the location had been changed several times. Too, it was found that the fence was never intended or regarded as a boundary. To the same effect is Arabie v. Terrebonne, La. App., 69 So.2d 516.
A fence, a levee and a road, under certain conditions, may constitute a boundary between two estates, such as where they form one continuous and uninterrupted visible line and are recognized and acquiesced in as such for the period of time prescribed by law. It is to be noted that the road relied upon here is not of the kind and character contemplated by LSA-C.C. Art. 828. Moreover, if it could be held that the objects relied upon constitute a boundary line, the evidence discloses that such line shifted and changed on each of said constructions; neither can they be said to have remained permanent and stationary or in any particular location for a period of 30 years. Our conclusion is that the objects relied upon are insufficient to constitute a boundary between said estates, for the reason they were neither erected nor constructed for that purpose nor recognized or acquiesced in as such for the prescriptive period. In fact, in eliminating the consideration of the so-called road which serves as part of said boundary, granting that either the fence or the levee would have been sufficient had they or either of them extended across and formed a complete separation of said estates, it is evident no visible boundary has existed for the required length of time for the entire distance between said properties. We are, therefore, constrained to hold, as did the learned trial judge, that there had never been a fixing of a boundary by agreement or by extrajudicial survey and that the two tracts have not been separated by visible bounds for thirty years or more. The plea of 30-year prescription was, therefore, properly overruled.
Defendants cite these cases in support of their position: D'Arby's Heirs v. Blanchet's Heirs, 7 La. 256; Opelousas Nat. Bank v. Perrodin, 121 La. 581, 46 So. 658; Opdenwyer v. Brown, 155 La. 617, 99 So. 482; De Bakey v. Prater, La.App., 147 So. 734; Henly v. Kask, La.App., 11 So.2d 230; Crow v. Brakey, La.App., 47 So.2d 357; Kobler v. Koch, La.App., 6 So.2d 55, together with authorities from other jurisdictions. Under the facts of each of those cases, we are in accord with the views therein expressed. Where the record definitely supports the conclusion that the boundary between two estates has been established and has existed by visible marks for a period of more than thirty years prior to the institution of a suit, the jurisprudence is well settled that such an existing boundary will not be altered despite its failure to accord with the ideal or perfect boundary. Crow v. Braley, supra, and the authorities therein cited. In each of the cited cases, the visible boundary, such as a fence or other objects forming a boundary demarcation, was shown to have existed at its location for at least 30 years prior to the institution of the action, and there had been *363 actual, continuous and unbroken possession to such boundary for that period of time.
On the merits defendants rely upon the survey as made by Ramsey, the correctness of which is opposed by the plaintiff and intervenor, who rely upon a survey made by S. D. Armstrong. A determination of this remaining issue depends upon which survey, if either, is accepted and approved. As observed by the trial judge, the importance of the decision of this case to the parties concerned is that the ownership of producing oil wells along the boundary between the two tracts of land will be determined in the fixing of said line. We appreciate, as did our learned and distinguished brother of the district court, the many difficulties involved in such controversies, of which the Supreme Court took notice in Russell v. Producers' Oil Co., 143 La. 217, 78 So. 473; 138 La. 184, 195, 70 So. 92, and which led that Court to say:
"The question to be determined is whether a well has been drilled upon the one side or the other of a line which should divide two quarter sections of land, in a section and township which have been surveyed and subdivided by the authority of the government of the United States. One might think it a very simple question, but it is not so. No one on earth can furnish the information necessary for its decision, save the gentlemen of the civil engineering and surveying profession, and those of them who have testified in that behalf, in this case, have arrayed themselves upon opposing sides, with a result which is thus referred to in one of the briefs filed on behalf of defendants, to wit:
"`If this method had been pursued (meaning if plaintiffs had brought an action of boundary), we should have been spared the protracted trial of 13 days, in the lower court, and this court would have been spared the labor of wading through 883 pages of closely typewritten examination and cross-examination, and reiterated re-examination and recross-examination, and reiterated re-re-examination and re-recross-examination, until the record is such a bulky mass and in such a confused condition that it must be read again and again before a fair conception can be formed of what is the substance of the testimony of any witness.'" [70 So. 95.]
From the record as thus made up, we find that the trial judge was ingenious in the development of the pertinent facts and exercised a dramatic fullness of particulars in pointing out the controlling decisions applicable to this litigaton. Therefore, we will adopt as our own the major part of his reasons for judgment.
"The boundary line which separates the two tracts here is the east and west half-section line, that is, a line connecting the east and west quarter corners of Section 33. It is conceded by all that, to establish these two quarter corners and the straight line between them, all four of the section corners must be located and established, since the original Government markings are lost and obliterated.
"Now, within this Township 21 North, the closest relevant recognized Government standard corners are as follows: To the west there is the southwest corner of Section 31 (the southwest corner of this Township 21 North), known as the Kidder Corner, and the northwest corner of said Section 31, also a Kidder Corner; to the north there is the northwest corner of Section 28, known as the Hobbs Corner, and referred to (as the southwest corner of Section 21) in Houston Ice & Brewing Company v. Murray Oil Company, 149 La. 228, 88 So. 802, [805,] and the northeast corner of Section 16, referred to (as the northwest corner of Section 15) in the same case. There are no recognized Government standard corners within this township east of the corners of Section 33.
"As we understand the rules set forth in the Surveying Manual and the text in evidence in this case, and the testimony of the several surveyors *364 whose testimony is also in the record, the preferred and primary method of establishing the southeast and southwest corners of Section 33 (since they are both on the south or base line of the township) would be to project a line between the nearest Government standard corner on the south line of that township west of the corners to be established and the nearest Government standard corner on the south line of that township to the east of the corners to be established using original Government calls for course and distance and apportioning the difference between said calls and the actual measurements on the ground over the whole distance run. This is what the surveyors call the single proportion method. The two corners thus established on the township line would be the south controls for establishing the two north (south) corners of the section. To establish the two north corners of said Section 33, that is, the northwest and the northeast corners, we understand, upon the same authority, that, since said two north corners are internal corners of the township and since each of these two corners is a corner common to four sections, the method of double proportion should be used, namely, project a line between the nearest Government standard corners within the township to the east and to the west of the two corners to be established, adjusting the difference between the Government calls and the ground measurements as in single proportion; then project a line between the nearest Government standard corners to the north within the township and the two reestablished corners on the south township line, adjusting the difference between the Government calls and the ground measurements as in single proportion, and the intersections of the line thus run and made to conform both in the east-west and northsouth directions would be the proper location of the two north corners of said Section 33. Having thus established the four corners of the section, the east and west quarter corners would be located equidistant between the southeast and northeast corners and between the southwest and northwest corners, respectively, and the straight line connecting these two quarter corners would be the boundary line between the two tracts.
"Unfortunately, as we have shown, the absence of Government standard corners within this township east of Section 33 makes it impossible to pursue in toto this preferred and primary method. Confronted with a similar situation in the Houston Ice & Brewing Company v. Murray Oil Company case, supra, the Supreme Court, through Chief Justice O'Niell, finding that the exact and preferred method had not been followed, remanded the case. It was found, to quote the Court, that `the record does not disclose that the method primarily required is impracticable.' The Court stated further that, `Any section corner or quarter corner that is identified as having been established by an official survey of the United States government must stand as being correctly located, however plain it may appear that the location is wrong; because the government surveys cannot be changed in an action at law between individuals.' However, the Supreme Court observed that if on the remand it should be found impracticable to follow the method primarily required, `The relocation of the * * * boundary line * * * will have to be made by some other method to be adopted by the surveyors.'
"In the original oral and written arguments of the case at bar defendants' counsel urged that since there was no Government standard corner on the south line of this Township 21 North except the one at the southwest corner of said township (the Kidder Corner), no acceptable survey in this case could be made without first relocating and reestablishing the southeast corner of the township to be used as the east control in locating and reestablishing the two south corners of Section 33. Mr. Ramsey, *365 the Court surveyor, undertook to locate this corner. Another surveyor called by defendants, Mr. McLemore, gave it as his opinion that that should be done. Mr. Armstrong did not do this in his survey and he is supported by two other surveyors, Mr. Dutton and Mr. Hyams, in his testimony that this was not necessary and could not be authoritatively accomplished under the circumstances prevailing here. To secure further information and enlightenment on this disputed point, we ordered the case reopened for the reception of certain evidence to determine the practicability of relocating the southeast corner of this township by appropriate surveying processes, as well as the northeast corner of Section 36, one mile north of the southeast township corner and on the range line separating Range 15 West and Range 14 West.
"The Court's idea in this reopening was to determine if possible (since the evidence on the first trial did not clarify the point in our mind) if the southeast corner of this Township 21 and the northeast corner of Section 36, one mile to the north, could be reestablished by any appropriate surveying process so as to give to them greater weight or authority as east controls than to internal corners in the township east of Section 33 used by Armstrong in his survey. We were not sure from the evidence adduced on the original trial that the southeast corner of this township, being a corner common to four townships, could not be relocated by the double proportion method, that is, by the use of controls in the form of Government standard corners to the north and south of this corner along the range line and similar corners of the township lines to the east and to the west. And, if this southeast township corner could be thus located and authoritatively reestablished, it was apparent that the northeast corner of Section 36 on the range line one mile to the north could likewise be established in the same surveying process. We were also inclined to the view that if these two corners, to-wit, the southeast corner of the township and the northeast corner of Section 36, could be thus reestablished, they would be entitled to such weight as would require them to be used as the east controls for any survey in this case.
"However, the evidence adduced on the reopening demonstrated, and it is now conceded by all, that this was entirely impracticable under the prevailing circumstances. There are no recognized Government standard corners on the range line to the north of the southeast corner of this Township 21 North all the way to the Arkansas state line, a distance of more than eleven miles, and none to the south. This range line is in Red River bottom land and the evidence is that recurring overflows, erosions, etc., over the years have destroyed or obliterated original markings and bearings. While there is the Kidder Corner, a Government corner, at the southwest corner of this Township 21 North, six miles west of the southeast corner on the township line, there is no Government corner on the township line to the east until the line reaches Red River, some 3½ miles away, on the other side of which lies Bossier Parish. There was some suggestion that this southeast corner could be located by reference to traverse points on stream crossings in all four directions from the corner, but this method was shown to our satisfaction to be impracticable, because of the absence of Government corners on the opposite sides of such streams from that corner with which to check such stream crossings or traverse points.
"We have concluded that it is impracticable under the existing circumstances to undertake to relocate the southeast corner of this Township 21 North and the northeast corner of Section 36 by any appropriate surveying process that would give them any superior weight as east controls for a survey in this case over internal corners *366 that were used in the Armstrong survey.
"And now, adverting to the two competing surveys submitted in this case, plaintiff and intervenor assert and, we think, demonstrate, erroneous surveying processes in the Ramsey survey and report rendering it unacceptable. We shall not discuss all such, but enough to demonstrate the basis of our conclusion. In the first place, Ramsey began his actual survey at the disputed and unproved southeast corner of this Township 21 North. The evidence convinces us that this corner is a lost corner, as that term is used in the surveying field. We have heretofore discussed the evidence pertaining to its efficient relocation. Mr. Ramsey accepted a 1¼" iron pipe he found in that vicinity as marking correctly that lost corner. We think Mr. Ramsey's acceptance of this 1¼" iron pipe as the true southeast corner of this township was not justified by the evidence upon which he based his acceptance, which evidence is set forth in his procès-verbal in the record. To begin a survey at a disputed and unproven corner when there were available recognized Government corners, as we have pointed out before, was error. This error, as we believe it to be, led Mr. Ramsey to the next error we think the evidence demonstrates.
"The first Government survey of this township was in 1837 by Williamson Jones, a Government surveyor, and in 1871 Parsons, a surveyor of the General Land Office of the United States, made a resurvey to relocate and restore the lost and obliterated corners, being sent into the area for that purpose. Using Parsons' notes, Ramsey ran west from his iron pipe at the southeast corner of this Township 21 North and at the south quarter corner of Section 34 he asserts that he has found the original Government corner there as relocated by Parsons, and he accepts his fixing of this corner as such. His evidence is that he found the remains of two original bearing trees found and noted by Parsons in 1871. Mr. Ramsey says he found twin pecan sprouts growing from an old rotten pecan stump which he identifies as one of Parsons' two bearing trees. He found no evidence of the other bearing tree mentioned by Parsons, but Mr. Ramsey even identifies which of the two was the one he accepted. Mr. Henry L. Bango, qualified as a forestry expert, examined the twin pecan sprouts and the stump and testified that the sprouts were not older than seven years of age and that the stump out of which they were growing was itself not older than seventeen years of age. The surveyor Armstrong expressed a similar opinion. We are satisfied that this could not be one of the original bearing trees found there by Parsons in 1871. We think, therefore, that Mr. Ramsey was not justified in accepting these pecan sprouts and stump as original evidence on the basis of which he fixed the south quarter corner of Section 34 and ascribed to it the dignity of a recovered Government standard corner. This south line of this township has been surveyed by many surveyors over many years before this case and none has reported finding any original evidence of the location of this corner, although such original evidence is always looked for by competent surveyors. Ramsey's corner here is some 40 feet south of existing occupation lines. It is 1½ miles east of the southeast corner of Section 33, one of the corners necessary to be fixed to determine the disputed boundary in this case. It is his east control (or should be, since he says he has found the Parsons Government corner confirmed by original evidence) for his fixing of the two south corners of Section 33. And Ramsey's southeast corner of Section 33, based on this east control, is approximately 37.8 feet south of occupation lines at that point and a concrete monument accepted and used by all the other surveyors who testified in this case and concerning which *367 we say more later, and had direct and immediate effect on his location of the east quarter corner of said Section 33.
"Continuing west on the south line of this Township 21 North, using Parsons' notes, Ramsey's survey and plat fix the southwest corner of this Township 21 North 58 feet west and 8 feet north of the Kidder corner there, a recognized Government corner and which, under surveying rules, and the Supreme Court's holding in the Houston Ice & Brewing Company case, supra, he was bound to accept and use.
"The evidence demonstrates another error in Ramsey's running of the west line of Section 33 which bears directly on his fixing of the west quarter corner of that section, one of the termini of the boundary line in dispute in this case. He runs north from his southwest corner of Section 33 two miles to the northwest corner of Section 28, a recognized Government standard corner, the Hobbs Corner. Mr. Ramsey so accepts and uses this Hobbs Corner. He finds some 90 feet of excess in this two miles over Parsons' calls. Instead of apportioning this excess uniformly over the whole of the two-mile distance, he arbitrarily apportions more than half of this excess to the line between the northwest corner of Section 28 and a traverse point on the west line of Section 28 described by the original Government surveyor, Jones, in 1837, as being 25 chains south of the northwest corner of that Section 28. The obvious effect of this was to drop his northwest corner of Section 33 considerably south of where it would be if he had uniformly distributed the whole of this excess over the entire two-mile course, as we understand surveying rules require. According to these rules and the testimony of all the other surveyors who testified in this case on this point, Mr. Ramsey's work here was in error.
"We refrain from further discussion of other asserted errors in the Ramsey survey, because we think that the points we have mentioned and discussed, manifestly having such an immediate and direct bearing and effect upon his location of the east and west quarter corners of Section 33, the termini of the boundary line in dispute in this case, amply demonstrate its unacceptability. It is, therefore, rejected.
"The only remaining question is, "Has the Armstrong survey correctly located the disputed boundary line according to the best surveying methods and processes which the circumstances permit?" And we are constrained, after the most careful consideration of which we are capable, to answer this question in the affirmative. We are aware of the difficulties, but in a boundary action though it may be impossible to determine with mathematical certainty the location of the disputed line, parties are entitled to have the limits of their property fixed. Louisiana Statutes Annotated-Civil Code, Article 823; Russell v. Producers' Oil Company, supra.
"In evidence in this case there are, besides Ramsey's, surveys by three other surveyors establishing the disputed boundary line in the case at bar: Armstrong's, one by Mr. Geo. E. Dutton, and one by Mr. J. C. McLemore, the latter being a witness for the defendant Pardue. All of these surveys, although varying slightly, are basically the same, and all three place the east and west center line of Section 33 as being north of at least three wells drilled under leases from Pardue covering the SW¼ of NW¼ of said Section 33. The Armstrong survey is the most comprehensive and, as we appreciate the evidence, it was thoroughly and accurately performed. We are unable to find in the testimony of the surveyors who testified in this case anything to justify a contrary conclusion.
"Armstrong used as west controls the two recognized Government standard corners, to-wit, the Kidder Corner at *368 the southwest corner of Section 31, being the southwest corner of the township, and the one at the northwest corner of said Section 31. As north controls he used the Hobbs Government standard corner at the northwest corner of Section 28 and the Government standard corner at the northeast corner of Section 16, both previously referred to in this opinion and in Houston Ice & Brewing Company v. Murray Oil Company, supra.
"In locating the two south corners of Section 33, Armstrong used as his east control the southeast corner of Section 34 as set by Mr. Martin, surveyor, in 1913 in the case of Bradford v. Brown, being No. 16,892 on the docket of this court. Procès-verbal and plat of Martin's survey in that case were approved and accepted as the basis of the Court's judgment, and they are in evidence in the case at bar. They show that Martin used that corner as control for fixing the northeast corner of the SE¼ of SE¼ of said Section 34, the east terminus of the boundary line in dispute in that case. According to Martin's plat and survey, in locating this southeast corner of Section 34, he surveyed the south line of this township beginning at the south quarter corner of Section 36, Township 21 North, Range 16 West, a point previously set by him. It is in evidence in this case that, between the southwest corner of Section 31, Township 21, Range 15 West, as fixed and used by Martin in that case and his southeast corner of Section 34, the section corners and quarter corners are marked by a row of concrete monuments, referred to in the evidence and by the local surveying profession as Martin's monuments, and presumably set by him. These corners, as we appreciate the evidence, conform closely to existing occupation lines and are generally accepted in the local surveying profession as correctly marking these corners. Martin's reputation and work as a careful and competent surveyor are attested by all the surveyors testifying in this case, without exception. It is also shown that Mr. Kidder, Director of Surveys of the United States General Land Office, sent here for the purpose, relocated the southwest corner of this Township 21 North, Range 15 West, in 1914, as Martin located and used it in Bradford v. Brown. This is the recognized Kidder Government standard corner to which such frequent reference is made herein. Mr. Armstrong accepted and used the so-called Martin monuments at the southwest and southeast corners of Section 33, but only after checking and verifying them against the Government calls of Parsons. In this check he ran the line between the Kidder Government standard corner at the southwest corner of this township and the Martin corner at the southeast corner of Section 34, as west and east control points according to the Government notes of Parsons and, using the single proportion method for adjusting difference, the so-called Martin monuments at the southwest and southeast corners of Section 33 checked within a foot or two. (See Armstrong's testimony at page 39 of the Note of Evidence taken on the trial of the plea of prescription on March 10, 1949.) With no more variation than that the testimony is that he felt justified, along with the other evidences of their correctness, some of which we have heretofore mentioned, in accepting these so-called Martin corners.
"Learned counsel for defendants urges that Armstrong was not justified in using this southeast corner of Section 34 as his east control in this portion of his survey. He says that this corner is not entitled to any authority in this case, because (1) it was not one of the corners actually fixed by the judgment of this Court in Bradford v. Brown, supra, but merely one of several corners used by Martin in making that survey, and (2) it has no authority in the instant case between different parties and affecting different tracts of *369 land two miles removed. But it is our view of this case that Armstrong used this corner as a weighted point in his survey not merely because it was used and its use approved by the Court in the Bradford case, but because, on the basis of all the evidence before him, including its use by the Court in that case, he was unable to demonstrate its incorrectness. And in the absence of any recognized Government standard corner to the east of the south corners of Section 33 (a matter we have heretofore discussed fully), it is Armstrong's position that, in view of all the evidence, he was required by sound surveying practice so to use it. His judgment in this respect finds ample support in the testimony of other surveyors in this case and we are constrained in our mind to agree. We recall again the Supreme Court's observation in the Houston Ice & Brewing Company v. Murray Oil Company case, supra [149 La. 228, 88 So. 805], when it said, on remanding the case, that if it should be found impracticable to follow the method primarily required, `The relocation of the * * * boundary line * * will have to be made by some other method to be adopted by the surveyors.'
"In locating the two north corners of Section 33, Armstrong used as his east control the northeast corner of Section 34 used by Martin in 1927 as a control point in the case of Logan v. Noel, being No. 45,452 on the docket of this court. Procès-verbal and map of Martin's survey in that case was approved and accepted as the basis of the Court's judgment and is in evidence in the case at bar. His acceptance and use of this corner is supported by the same character of evidence, checks and considerations, as those supporting his use of the southeast corner of that same section. In the absence of any recognized Government standard corner to the east of the two north corners of Section 33, it is not only impracticable but impossible to follow here the method primarily required, making necessary the adoption of some other method. His judgment here in using the northeast corner of Section 34 as the nearest practicable substitute for a Government standard corner in that direction finds ample support in the professional testimony in this case and impresses us as sound. We find nothing in the record pointing to a more suitable, practicable, or more authenticated corner in this direction within this Township 21 North.
"Armstrong's survey shows a complete and accurate connection of the Kidder Government standard corner at the southwest corner of this township and the southeast corner of Section 34, applying the applicable single proportion method, and thus verifying the correctness of the so-called Martin monuments at the southeast and southwest corners of Section 33. He then used this southwest corner of Section 33 and the northwest corner of Section 28, the Hobbs Government standard corner, for the latitudinal control to reestablish the northwest corner of Section 33. He then used the Government standard corner at the northwest corner of Section 31 and the northeast corner of Section 34 for control of departure, thereby completing the double proportionate rule as prescribed by the General Land Office for interior section corners for the restoration of the northwest corner of Section 33. He then used this southeast corner of Section 33 and the Government standard corner at the northeast corner of Section 16 as the latitudinal control for the restoration of the northeast corner of Section 33, which, with his use of the aforesaid corners of Sections 31 and 34 for control of departure, completes the double proportionate location and restoration of the northeast corner of Section 33.
"Having thus established all four corners of Section 33, Armstrong then located the east and west quarter corners of the section equidistant from the reestablished section corners to the north and south, respectively, and then *370 connected these quarter corners with a straight line, thus establishing the boundary line between the two tracts involved in this case.
"We are convinced, after long and careful study of this case, that the Armstrong survey has properly and accurately located the disputed boundary line in the case at bar.
"Accordingly, there will be judgment herein fixing said boundary line as located by S. D. Armstrong, surveyor, as shown by his plat of survey filed in evidence herein as Arkansas Exhibit-7, the costs hereof to be paid one-half by plaintiff and intervenor and one-half by defendants."
For the reasons assigned, the judgment appealed is affirmed; costs of this appeal to be paid by appellants.

Supplemental Opinion
PER CURIAM.
The question of appellate jurisdiction has been inextricably involved with the issues tendered on appeal in the instant case, and, unfortunately, has caused a considerable delay in the determination of this appeal. The court feels that it is highly desirable, first, that the jurisdictional question itself be developed for the purpose of a comprehensive understanding by both Bench and Bar of the State, and, second, with the hope of inspiring such corrective legislation as may be necessary to clarify the question of jurisdiction in aiding the promotion of a modernized appellate procedure.
In view of the fact that this court has had no opportunity to present the reasons for its action with respect to the matter of jurisdiction, in the instant case we think it proper to avail ourselves of this opportunity for such purpose.
As stated in the opinion, this suit, which is an action for the fixing of a boundary, involves a tract of land between the contested lines, 80 by 1,320 feet, on which were located, at the time of trial, three producing oil wells, and, accordingly, it is the value of this strip which would determine jurisdiction. New Orleans & Northeastern R. Co. v. Redmann, 210 La. 525, 27 So.2d 321.
A better understanding of the problem presented may be obtained by a brief chronological resume of the course of the instant case in the effort to determine its appropriate appellate home.
After trial in the First Judicial District Court in and for Caddo Parish, Louisiana, the district judge rendered a written opinion which was filed March 10, 1952; an affidavit executed by the attorneys for the plaintiff, two of the defendants and the intervenor, fixing the value of the property involved in excess of $5,000, by stipulation and agreement, was filed in the suit on March 21, 1952, and on the same day judgment was read and signed. On motion of attorneys for two of the defendants orders of suspensive and devolutive appeal were granted to the Supreme Court of Louisiana, returnable May 12, 1952, and the suspensive and devolutive bonds were fixed on March 21, 1952; on June 1, 1953 the Supreme Court handed down its opinion and judgment decreeing that the appeal be transferred to the Court of Appeal, Second Circuit of Louisiana; Beene v. Pardue, 223 La. 417, 65 So.2d 897. The opinion noted the stipulation with reference to the value of the property involved and further called attention to the filing in the Supreme Court of affidavits by four individuals after the appeal had been perfected. The court found that, other than the said stipulation and affidavits, the record did not reflect the value of the land in contest and the opinion declared:
"The recent rulings of this Court all strongly indicate that before jurisdiction on the basis of the amount in contest or dispute will be entertained, the record in each case must affirmatively show what the amount is and also, that it is the amount in dispute at the time the case is submitted to the trial court *371 that determines jurisdiction. See Kennedy v. Perry Timber Co., 217 La. 401, 46 So.2d 312, and cited cases."
Pursuant to the transfer by the Supreme Court the matter was tendered to this court on appeal. We accepted what we thought was the plain and literal interpretation of the language of the Supreme Court that jurisdiction is dependent upon an affirmative showing of value as contained in the record of each case, and concluded, as we observed in our opinion, 67 So.2d 337, that the orderly disposition of the appeal would best be served by the fixing of the value of the property. For such purpose we remanded the case to the First Judicial District Court in and for the Parish of Caddo with instructions that it receive competent evidence as to the value of the property in dispute, as of the time of trial, following which the appeal be ordered to the court of appropriate jurisdiction.
We wish particularly and emphatically to point out that the opinion of the Supreme Court, to which reference is above made, did not specify the necessity for an affirmative showing of value as being peculiarly and exclusively related to the jurisdiction of the Supreme Court, and we therefore accepted and adopted the expression as being the enunciation of a principle governing appellate jurisdiction applying as well to Courts of Appeal as to the Supreme Court.
After the reopening of the case for the taking of evidence as to value, in compliance with our order of remand, the testimony of witnesses established the value as of the time of trial in varying amounts from, approximately, $15,000 to $25,000. The judge of the district court then granted an appeal to the Supreme Court.
On December 13, 1954, the Supreme Court rendered judgment annulling and setting aside our order of remand, of date September 30, 1953, and all proceedings in the district court "under this unauthorized order"; set aside the appeal "taken from the unauthorized proceedings" and ordered the record to be transferred to this court "in order that it may hear and dispose of the appeal previously transferred to it by this Court on June 1, 1953." 226 La. 606, 76 So.2d 902, 904.
The opinion declared:
"It is now well settled in the jurisprudence of this State that the record, as made up, must show that the value of the thing in contest exceeds $2,000, exclusive of interest, in order to vest this Court with appellate jurisdiction and that the appellate jurisdiction of the case must be determined from the record presented."
The opinion further declared, for the first time as far as we have been able to determine:
"Once this Court has transferred a case to a court of appeal that court must entertain the appeal. The decision of this Court in that respect is final and cannot be circumvented."
The opinion further held that the Court of Appeal has no authority to remand any case for the purpose of fixing appellate jurisdiction. The opinion further stated:
"In other words, it (the court of appeal) may issue writs and orders to sustain or enforce its appellate jurisdiction but it cannot issue orders designed to controvert or destroy its jurisdiction."
The opinion quoted Article 906 of the Code of Practice as constituting the only authority for the remand of a case by the Court of Appeal and observed that the said article does not authorize a remand for fixing the court's appellate jurisdiction. The court further declared that the right to remand a case is restricted and cannot be extended for purposes not included in the article. Without any desire to belabor the point or to argue the proposition, we simply observe that it was our opinion that the wording of the article granting the right to remand for certain specified purposes "or otherwise" comprehended authority to remand for the purpose of ascertaining jurisdiction in order that the constitutional provisions with respect to the apportionment of jurisdiction between the Supreme Court *372 and the Courts of Appeal might be observed.
Also on December 13, 1954 the Supreme Court rendered judgment in Ilardo v. Agurs, 226 La. 613, 76 So.2d 904. This case was originally appealed to this court and was remanded to the lower court for the purpose of adducing evidence establishing the value of the right in dispute and the granting of an appeal to the appropriate appellate tribunal. The judgment of the Supreme Court annulled the order of remand and all proceedings pursuant thereto and ordered the case transferred to this court to be heard and disposed.
In the opinion in the Ilardo case the court observed that there was no affirmative showing of jurisdiction in the Supreme Court but that the record did affirmatively show jurisdiction in the Court of Appeal which should have entertained the same.
As best we interpret the opinion, the declaration of the affirmative showing of jurisdiction in the Court of Appeal is based upon the principle that the Court of Appeal is vested with jurisdiction of all appeals, of which the district courts of the state have exclusive original jurisdiction, except with respect to those cases in which the record affirmatively establishes a value in excess of $2,000.
The Supreme Court some few years ago abandoned the recognition and acceptance theretofore accorded affidavits establishing value for the purpose of appellate jurisdiction, see New Orleans & Northeastern R. Co. v. Redmann, 210 La. 525, 27 So.2d 321, and announced a new rule discontinuing that established practice. Duplantis v. Locascio, 223 La. 11, 64 So.2d 624.
The Supreme Court has further declared that it would not accept stipulations of counsel with reference to jurisdiction. Adger v. Oliver, 222 La. 793, 64 So.2d 6, on the ground that "jurisdiction cannot be conferred by consent of the parties."
We feel impelled to observe that under the holding of the Supreme Court in the instant case the conferring of jurisdiction by the parties may be accomplished by indirection, notwithstanding the fact that jurisdiction cannot be conferred by consent in response to a direct stipulation. This is so because now it will be possible for counsel, whose stipulation of jurisdictional value would be unacceptable, to channel their appeals by the simple method of failing to affirmatively establish value in the record of any case. It is primarily for this reason that we have been moved to present this matter of jurisdictional confusion, for we are convinced that the Supreme Court did not intend to open the door for the achievement by indirection of an end which it has prohibited by direct action.
The Supreme Court has seen fit to harshly characterize our actions in the Pardue and Ilardo cases as being "unauthorized", "ultra vires", and "illegal"; it has implied that this court has sought to illegally extend its powers, even to the extent of altering constitutional provisions, and that it has attempted to circumvent the orders of the Supreme Court itself. The dignity of this court and the sincerity of its members requires that we protest such characterizations and such implications as being unwarranted. We firmly believe that the confusion has arisen from the fact that the jurisdictional provisions of the Constitution of 1921, under which we are still attempting to operate, are so ambiguous, so outmoded and antiquated, that they stand in sore need of immediate revision and modernization. The maximum jurisdiction of $2,000 applied to this court today is a ridiculous contrast, from the viewpoint of economic value, to the same figure in 1921. The result clearly has been to overburden the Supreme Court with appeals in matters which should properly be brought before the Courts of Appeal.
The need for relief addresses itself to the members of the legal profession and the Legislature. It is hoped that the exposition of this one specific instance will serve to arouse a cooperative effort designed to remedy the existing condition.